## KENTUCKY–TENNESSEE LIGHT & POWER CO. v. CITY OF PARIS, TENN.

## CULLEY v. KENTUCKY–TENNESSEE LIGHT & POWER CO.

### Nos. 5635, 5636.

Circuit Court of Appeals, Sixth Circuit.
April 8, 1931.

of Paris, Tenn., on the brief), for Kentucky-Tennessee Light & Power Co.

R. L. McReynolds, of Clarksville, Tenn., and Y. Q. Caldwell, Jr., of Paris, Tenn., for W. Y. Morris and others.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

DENISON, Circuit Judge.

The city of Paris, Tenn.—hereafter called the city—owned and operated electric light and water plants, with the necessary distribution systems, for supplying itself and its citizens. Its governing body decided to sell the combined plant for private operation. Byrd, purporting to act in his own interest, but with the declared intention of making a transfer to an operating company, negotiated and closed a contract which gave him a lease, an operating franchise, and a contract to buy. Later, he made such transfer, and, with the consent of the city, the Kentucky-Tennessee Light & Power Company—hereafter called the company—was substituted for Byrd and took over the plants and began operations. This was in January, 1926, and it continued operating and performing its obligations under the contract until June 9, 1928. On that date, the city commenced this suit by filing a bill in a state chancery court. The bill claimed that the contract had been obtained through fraud and asked its cancellation. The case was removed to the court below, and heard in open court. The trial judge found the existence of sufficient ground to justify the city in claiming a rescission, and made a decree accordingly; but directed that the city, as a condition of the rescission, should repay to the company various items expended by it in additions, improvements, purchase price installments, and other matters, of which the city would get the benefit upon rescission. The company appealed, and what was called a cross-appeal was taken by Culley et al., who had assumed to intervene as plaintiffs. The city did not appeal. The company complained, both because a rescission had been ordered and because, if there were to be a rescission, there should have been larger repayments. The cross-appellants complained because any repayment had been directed.

█ It is plain that the so-called cross-appeal must be dismissed. The issue joined between the city and the company came on for hearing on the day fixed. On that day, Culley and three others filed in the court what they called an amended bill, consisting of seven paragraphs to be added to the original

William Marshall Bullitt and J. E. Tarrant, both of Louisville, Ky. (Bruce & Bullitt, of Louisville, Ky., and J. W. Van Dyke,

bill. It was signed by the solicitors for complainants, and alleged that Culley and three others were citizens, residents, and taxpayers in the city, "and that, in such capacity, they stand in danger of having their taxes materially increased, and will suffer financial loss unless the relief sought in this bill is obtained, and that they are, for that reason, interested in the matters in this bill alleged and entitled to the relief herein prayed. Therefore, they ask to be made parties complainant to the said bill." Doubtless the complainant, the city, should be considered as consenting to this amendment and (in effect) intervention; but the record shows no notice to defendant, nor was any order made by the court. The amendment was an attempt to make new parties complainant, bring in new interests, and perhaps avoid defenses that might be good against complainant. Defendant was entitled to notice before the amendment could be permitted; but, even with notice, the amendment could not have been allowed. Such a suit by taxpayers, even though not controlled expressly by general equity rule 27 (28 USCA § 723), is by the general principles of equity permitted only when the municipal corporation has refused to act in disaffirmance of the contract of which the taxpayers complain. Here the taxpayers purported merely to be joining in claiming the same rights which the city was already claiming in their behalf, and they were plainly not entitled to sue. City of Princeton v. Princeton Co., 166 Ky. 730, 744, 179 S. W. 1074. The defendant was under no obligation to have them dismissed from the record as parties, because they never had been admitted. They had no status which entitled them to appeal from the decree, and their appeal is dismissed.

It should be noted that this dismissal is, in view of our later conclusions, of little practical importance. The only position taken by cross-appellants in their brief, as filed, is that the contract of lease and sale was so ultra vires as to be void and incapable of ratification, or as not to justify requiring restoration as a condition of rescission; and these questions are necessarily involved in passing upon the appeal of the company.

■■ A question of practice should be noticed. After the cause was at issue, it was by the clerk put upon the trial calendar for the next term, and was called for trial on the second day. Defendant then requested a postponement, both because its leading counsel was otherwise engaged and because the practice did not permit so summary a setting. So far as the application depended upon the absence of one of the counsel and appealed to the discretion of the court, involving several considerations, we cannot say that the discretion was abused. We are not referred to any general equity rule or to any special equity rule of this district which we think governed the situation. The matter of setting for trial was therefore to be disposed of by the court in any reasonable way; and, since the trial was to be in open court, as in a suit at law, it was natural and reasonable to apply the special law rule, said to have been long recognized in this district, and which directly authorized the course taken. The objection made is that the time provided by general equity rule 47 (28 USCA § 723) for taking depositions had not expired, and so the setting was premature. We think the rule should not be so applied. It applies only to cases where the court has made an order permitting depositions to be taken; and here there had been no such order. There are statutes authorizing depositions; but we know of none fixing a minimum time limit therefor.

■■ Coming first to the question of power: We think the power was clear. Whether the construction and operation of municipal water and light plants to furnish water and light to the citizens should be considered as an exercise of the governmental power, or as the doing of business in a proprietary capacity, no one doubts that the General Assembly could, by express words, grant to the municipality the right to sell or convey such a plant. The city charter is found in a special or private law, which is chapter 528 of the Private Acts of 1921. One of the granted powers is that the city "may purchase and hold property, real and personal, within and beyond the limits of the City for * * *, the erection and extension of water works, electric lights, parks and for any other corporate purpose and shall have power to sell, convey and do such acts relating to same as natural persons." Section 4. We pass by all questions as to whether this power supported the contract which was made with the company, because we find that, in 1927, the General Assembly ratified this contract, by chapter 661 of the Private Acts for that year (volume 2, p. 2105). The act provided "that all sales, leases, rentals or other dispositions of municipally owned water, electric or other utilities, for consideration, heretofore bargained, sold and conveyed, leased or rented by municipalities in the State of Tennessee in counties of a population * * * not less than 27,151, and not over 27,170 * * *

according to the last Federal Census * * * shall be, and are, hereby validated as legal and binding transactions."

The city of Paris is in Henry county, and the population of that county, by the census referred to, was 27,151. This particular contract was therefore within the ratification.

 It is probably, on its face, clear enough that this ratifying act picked out five particular counties in the state, within each of which was a city which had made such contracts, classifying and describing these counties by population. Whatever might be thought of the political desirability of identifying cities in this way, such considerations are for the Legislature. Tennessee has a constitutional provision (section 8, art. 11) against class legislation, but permits classification of counties by population for some purposes and not for others. In any view, this statute is no more obnoxious than if it named and applied only to the city of Paris; and, since charters are granted by special act, they may be amended by special act, relative to that city alone. Note 30, section 8, art. 11, Shannon's Ann. Const. of Tenn.

 If this statute were to be taken as ratifying the named contracts, even though they had been induced by fraud, it might be open to the constitutional objection, but we see no such intent. We think its only purpose and effect, as to our contract, are to clarify, and possibly amplify, the power of conveyance and sale given to the city by the original charter; it was in effect nothing but an amendment of the charter in that respect.

 Whatever the Legislature might originally have authorized, it can ordinarily ratify; and such a ratification is equivalent to an original grant of power. Los Angeles City Water Co. v. Los Angeles (C. C.) 88 F. 720, 742. See, also, cases cited in note 84, p. 292, C. J. Art. Municipal Corporations.

 It is also urged that the ratification was unconstitutional because the act was not read three times in each house, as required by section 18 of article 2 of the Constitution of Tennessee; and, in support of this objection, we are cited to Erwin v. State, 116 Tenn. 71, 80, 93 S. W. 73, and State v. Base Ball Club, 127 Tenn. 292, 300, 154 S. W. 1151, Ann. Cas. 1914B, 1243. No evidence was introduced to support this objection; but we assume that we should take judicial notice of the published journals of the Legislature— at least within the states of this circuit.

Their contents upon this subject are stated in the note.[1]

We see no way in which judicial notice can extend further than the journals themselves. If the original bills are preserved, and could be used for comparison to amplify the journals, they must be introduced and proved. In each of the cases cited, the act in question had the effect to create a crime, and the amendment, made in both the body of the bill and in the caption, enlarged its effect, and made that action a crime which otherwise would not have been. The utmost inference which can be drawn from the journals in this case is that the title and body of the act, as introduced, were in the final form to and including "State of Tennessee," and that the amendment, made upon the third reading, limited its effect to the five classes of counties specified. Neither the letter of the Constitution nor the authority of the cases cited, nor the public policy said to be involved, leads necessarily to the conclusion that this act is, for this reason, unconstitutional. See Tenn. Co. v. Hooper, 131 Tenn. 615, 175 S. W. 1146. The federal courts, lacking a controlling decision by the state court, do not, except in the clearest cases, hold that the state Legislature has violated the state Constitution; and the violation, in the present case is, to say the least, not clear.

 The same general consideration applies to the further objection that the statute is unconstitutional because section 17, art. 2, of the Constitution, says that no bill shall embrace more than one subject. The subject of this bill is the validation of certain con-

[1] House Bill 1340 passed its first reading on April 20, 1927 (H. J. 1314), its second reading on April 22 (H. J. 1421), and its third upon April 28 (H. J. 1595). Upon the third reading Senate Bill 944 was substituted for H. B. 1340, and it passed its third reading in this substituted form. Nowhere in these Journal records is the title of the bill given in full, but each reference is made by some short or summary title, no two of them being alike. The Journal therefore gives no information, either as to the title or the body of House Bill 1340, in its original form.

Senate Bill 944 passed its first reading on April 20 (S. J. 889), its second on April 21 (S. J. 893), and its third on April 26 (S. J. 1062). This also is referred to each time merely by a short identifying title, not being the same as any of the short titles used in the House Journal for 1340; but there is nothing to show that, in the body of the bill or the full title, it differs from the same parts of 1340. Upon the third reading, this bill was amended as to its caption and as to its body so as to apply only to the classes of counties specified in the act as published. There is, therefore, nothing to show that any material change was made, either in the body or the title of the act; or, if it nevertheless might be presumed that there was a material change, it probably consisted (or perhaps did) in lessening the territory to which the act applied.

tracts made by certain classes of cities. There is nothing to show that they are not sufficiently related to constitute one subject, within the meaning of the Constitution; and we find no state court decision to the contrary.

Since we do not interpret this ratification statute as intended to bar disaffirmance on the ground of fraud, that subject must be considered upon this record. It is not easy to select, out of the general allegations and proofs herein, the definite basis upon which the claim of fraud must rest in order to have legal recognition; but, if we lay aside all those matters of fact and opinion about which the mayor and council knew as much or more than Byrd, and those alleged representations as to the effect of the contract which were in the teeth of its plain terms and about which intelligent business men, dealing at arm's length with a purchaser, cannot be heard to say they were deceived, there remain only the claims that the city attorney, two members of the council, and the operating head of the plant had some secret adverse interest which undermined the city's conclusion to make the contract, and entitled it to rescind when this was afterwards discovered. As to those other than the city attorney, there is no proof requiring serious attention. As to him, it appears that he advised, and to some extent represented, the city in details which arose in the drafting of the contract, and perhaps approved of the contract in a general way, that the city did not pay him for these services, and that he was paid therefor the sum of $2,000 by Byrd. The company insists not only that, as a purchaser from Byrd, it should not answer for Byrd's misconduct in this respect, if any there was, but that there was no misconduct. It insists that the record shows that the city attorney had nothing to do with the city's determination to make the contract, and that the mayor and council understood that the city attorney's charges for his services were to be paid by Byrd, and knew at the time that they were so paid. We find no occasion to pass upon these issues; but, for the purposes of this opinion, assume, not only Byrd's agency, but also the fact of Byrd's payment to the city attorney was not known to, or approved by, the city, and was of sufficient importance so that the city might have rescinded, promptly upon discovery.

While it is to be conceded that a municipal contract which is void for lack of power to make it cannot become valid by acquiescence or ratification, yet, when the power exists and the city has entered into a contract with another party, which contract is later said to have been induced by fraud practiced upon the city, the rule is the same as between individuals. The city, upon discovery of the fraud, must elect, with the promptness which the circumstances require, whether it will continue to take the benefit of the contract, and therefore affirm, or will repudiate and demand such restoration of the former status as the then developed situation permits. The city can claim no exception from the familiar rule.

This contract went into effect in January, 1926, provided for the leasing to, and contemplated the eventual sale to, the company, and the furnishing of light and water by the company, upon terms which were then believed to be—and are still by strong proof indicated to be—very advantageous to the city and its citizens. Among these terms were lease payments of about $2,500 per month, which would provide for the current interest on the city's bonded debt and cover the city's water and light and leave a monthly surplus; the reconstruction and modernization and extension of the plants, and particularly of the electric portion; and the payment of the city's bonded debt, as it fell due. The company promptly proceeded with this part of the contract, and made large investments in these improvements and extensions. No dissatisfaction was expressed for several months. Then a controversy arose as to whether the company was obliged to furnish, without charge, water for certain drinking fountains. No agreement being reached, the city, in July, 1927, filed a bill for the specific performance in this respect of its contract, as the city understood it. This case was prosecuted by the city to final decree in its favor, which seems to have been given on May 28, 1928. From this decree the company appealed, and the decision of the appellate court affirming was rendered at some time after the present suit was commenced. During the trial of this drinking fountain case, and on August 16, 1927, the former city attorney testified fully to the facts as to the receipt of this fee by him in the manner which has been stated. The record of that trial indicates that this fact was, before that time, known to the successor attorney and to the city, but full knowledge after this date cannot be denied. The present suit for rescission was not commenced until June 9, 1928, an interval of more than nine months. During this time, the city continued to receive its monthly payments under this contract, and the company continued to perform and to make extensions, reconstructions, and improvements, and, as late as March, 1928, paid $25,000 of the city

bonds. In fact, one monthly payment under the contract was received by the city after this rescission suit was begun. These facts seemingly lead so inevitably to the conclusion that the city elected to affirm and not to rescind that we must go to the excuses alleged to neutralize this apparent affirmance. We find nothing of substance. The present city attorney testifies in rather vague and general terms that the fraud was not discovered until shortly before the bill was filed; but he does not contradict the specific facts which we have recited. He says, also in general terms, that, after the discovery of the fraud, there were negotiations between the city and the company for a revision of the contract. A distinct notice from the city that because of the discovered fraud it intended to rescind unless the company would make concessions, and a serious consideration of this proposition by the company, doubtless would excuse considerable delay in actual rescission. Even that might not justify the continued acceptance of benefits and claims of other benefits under the contract; but there is nothing to show that any such notice was given or any real negotiations entered upon.

Our conclusion is that, without considering the other substantial questions involved, the bill must be dismissed, because it clearly appears that, after the city knew the facts upon which it now bases its claim of right to rescind, it not only unduly delayed rescission, but it continued to accept benefits under the contract, and thereby affirmed.

The decree is reversed, and the case remanded, with instructions to dismiss the bill.