**AMERICAN INS. CO. v. LUCAS, Superintendent of Insurance Department of State of Missouri, et al.**

Nos. 270–426, in Equity.

District Court, W. D. Missouri, Central Division.

April 12, 1941.

See, also, U. S. v. Pendergast, D.C., 39 F.Supp. 189.

William Marshall Bullitt, of Louisville, Ky., and David A. Murphy, of Kansas City, Mo. (E. R. Morrison and Homer H. Berger, both of Kansas City, Mo., on the brief), for Insurance Co.

Charles L. Henson, of Jefferson City, Mo. (Charles J. Harvey, of St. Louis, Mo., and William G. Chorn, of Jefferson City, Mo., on the brief), for Ray B. Lucas and others.

Before STONE, Circuit Judge, and REEVES and OTIS, District Judges.

STONE, Circuit Judge.

Motion for new trial has been filed by each of the companies. These motions are identical except as to the grounds urged why Findings of Facts VIII and IX are (it is claimed) erroneous. As to these two findings there is but one difference in the motions: The so-called New York and Hartford companies set forth identical grounds and the other companies set forth identical

grounds differing from those of the New York and Hartford companies.

The motions are divided into three general headings: erroneous statements in the opinion; erroneous findings of facts; and erroneous conclusions of law. In addition, the jurisdiction of the court is again attacked in brief and oral argument.

## I. Jurisdiction.

In the opinion (p. 54), (38 F.Supp. 922)[1] we stated "We have no doubt of the *jurisdiction* of this Court to act as the Superintendent contends". We did not reach this conclusion without due consideration of the contentions, in that respect, of the companies. We simply did not set down the reasons therefor. Since these contentions are again urged in connection with the motions for new trial, we think it best to discuss and determine them with particularity rather than rely upon the bare statement of conclusion in the opinion. We shall dispose first of this matter of jurisdiction and then take up the contentions in the motions as to other matters.

### (a) Complete Lack of Power in the Court.

Each of the companies attacks the jurisdiction of this court to distribute the funds to the policyholders "as such action would automatically set aside or modify the decree of February 1, 1936" ("Memorandum for Insurance Companies", p. 2, filed June 24, 1939). They assert that this cannot be done "because (1) the term at which the decree was entered has expired, (2) the decree was not void, but at most only *voidable*, and (3) the alleged injured party has not taken the requisite steps which, under an exception to the general rule, sometimes permit a decree to be set aside even after the term at which it was entered" (same, p. 2).

Obviously, the contentions above rest upon the one matter of the power of a court of equity to open its decree after expiration of the term of court during which the decree was entered.

The companies concede that decrees may be opened or vacated, after the entry term, for mistake or for fraud inducing entry of the decree. Their position is that this can be done, as to fraud, only for "extrinsic" fraud and then only "by an independent bill in equity" (Memorandum, supra, p. 4). They contend that no such independent bill has been here filed.

▪ That the bribery here involved would be such "extrinsic" fraud is certain. Barnett v. Kunkel, 8 Cir., 259 F. 394; and compare Arrowsmith v. Gleason, 129 U.S. 86, 9 S.Ct. 237, 32 L.Ed. 630; and Johnson v. Waters, 111 U.S. 640, 4 S.Ct. 619, 28 L. Ed. 547. Therefore, the real issue is as to whether relief can be obtained only by an original bill in equity.

What form of proceeding must or may be employed depends upon the situation to which the proceeding is to be applied. If the relief is sought in the same court from a fraudulent *judgment at law*—which really is not a proceeding to affect the *judgment* but only its *enforcement*—obviously, the procedure must be by original bill for, in such situations, courts of law have no such jurisdiction and equity does not act upon the judgment itself but upon the *parties* to the judgment. The same result applies where the proceeding is in a different court from that entering the judgment or decree—

---

[1] In the course of this opinion, it will be necessary to refer to or quote from various different and separate printed or typewritten papers. We are compelled to take these matters in the present physical forms before us. Each is separately paged and our references have no choice but to use the paging in the present form. This situation is likely to be confusing to a reviewing court, but we have no choice since that is all we have at present. If this opinion (abundant with such references) is to be intelligible, the paging must be preserved.

Also, while many of the now separate matters would naturally be included in any transcript to a reviewing court, yet there are others as to which this is not necessarily true.

Therefore, *two things are necessary*: (1) that all of the separate matters to which this opinion makes page references should, in some form, be taken to the reviewing court; and (2) that the present paging be preserved therein.

Such matters are: (1) Transcript of Oral Argument (on May 29, 1939, on issuance of restoration and show cause orders), (2) Memorandum for Insurance Companies (filed June 24, 1939), (3) Record of evidence taken before the Special Master, (4) Report of Master, (5) Brief for Fire Insurance Companies (on merits), (6) Transcript of Oral Argument at hearing on May 20, 1940 (on merits), (7) Motion for New Trial, (8) Suggestions of Plaintiff Insurance Companies in Support of their Motions for New Trial.

this is true because, among other reasons, no court (except by way of some appellate review procedure) has any jurisdiction to open, vacate or alter the final determination of another court.

■ Where the proceeding is in the same court and is directed against a decree in equity, the situation is different because the court is called to act upon its own earlier action and the original matter is already in equity. In such situations, the name or the form of proceeding is not of controlling importance; *provided*, it affords adequate opportunity for interested parties to support and to contest the relief sought—this opportunity includes the necessary elements of due process, such as sufficient notice, production of evidence and proper hearing in other respects. The ordinary procedure is by bill of review but, where the above essentials are preserved, procedure by motion has been approved by the Court of Appeals of this Circuit (United States v. Williams, 8 Cir., 67 F. 384, 386) and other courts. United States v. Sterling, 2 Cir., 70 F.2d 708, 711, certiorari denied sub nom. Commercial Trust Co. v. United States, 293 U.S. 584, 55 S.Ct. 97, 79 L.Ed. 679; In re New England Oil-Refining Co., 1 Cir., 9 F.2d 344, 346; Winslow v. Staab, 2 Cir., 242 F. 426, 431.

■ Does the present proceeding comply with the above requirements as to due process? It is initiated by the Superintendent of Insurance through a "Motion * * * for Citation". The relief sought is not summary action solely upon the motion. It is for a show cause order against the companies. This means, necessarily, the framing of issues and a hearing thereon before any relief is possible. Issues were so framed by the motion and the answers of the companies; full opportunity for evidence from both sides was given and such evidence produced; and a full hearing had thereafter through briefs and oral arguments. Every possible opportunity was afforded to and availed of by the companies fully to present their issues, evidence and views. A formal original bill or a bill of review could not have secured more for the companies than they actually had. The proceedings here are in every respect sufficient and the jurisdiction of the court is assured.

■ All that has been said above would apply were this proceeding merely by one party to seek relief from opposing parties for claimed fraud alleged to have induced an unfavorable decree. There is an additional consideration here arising from the pleaded basis for the relief. That basis is "unclean hands". The motion presents a situation calling for the exercise of the powers of the court upon that basis and invokes its action. This vitally affects the court itself by bringing to its attention a situation which involves protection of its own integrity and of the public policy requiring such protection and affords the means of so doing. If proved facts require action by the court in such a situation, that action must be in and must be effected upon the litigation resulting in the decrees. Therefore, if a selection of a particular form of proceeding is necessary, it would seem the one here adopted would be more appropriate than an original bill or a bill of review.

There is yet another consideration. If the contention of the companies that these decrees cannot be opened be correct, the situation is that a court would be powerless to protect itself against the most outrageous imposition upon it in entry of a decree unless it discovered the imposition and acted thereon within the decree term. This brings into direct conflict two established rules of public policy. One is the desirability of finality of decrees after the entry term, based upon the public policy that there should be an end to litigation. The other is the protection of the integrity of judicial action, based upon the public policy that courts of justice must not be used as instruments to effectuate frauds or injustices.

One of these rules must give way to the other. We can think of no rules of public policy attaching to the judiciary of equal importance to those which protect the integrity of the exercise of judicial power. Congress has sought to aid this public policy not only by making criminal various particular acts tending to thwart just results in the courts (U.S.C.A. Title 18, chap. 6, § 231 et seq.) but by making criminal any act influencing, obstructing, or impeding "the due administration of justice" (U.S. C.A. Title 18, § 241). But before and without any such legislation, courts in the Anglo-American judicial systems had devised the remedy of contempt and courts of equity had evolved the ancient remedy of "unclean hands". All of these methods are useful and none of them should be weakened. As said by the Court of Appeals for this Circuit: the "first duty [of a judicial officer] is to see that those who

minister in the temple of justice shall not invoke his authority for the accomplishment of fraud." Zeitinger v. Hargadine-McKittrick Dry Goods Co., 8 Cir., 244 F. 719, 723. In the Zeitinger case, the District Court denied an intervention (pleading a rank imposition upon the court in a bankruptcy matter) on the ground "that it was helpless to prevent what was apparently a fraud on its own jurisdiction, that of the circuit court, and upon interveners, because it was of the opinion that no defense could be made to the voluntary petition in bankruptcy." 244 F. at page 722. As to that action, the Court of Appeals said: "The District Court, however, could have safely relied upon the proposition that there is and can be no law or practice which would compel a court of bankruptcy or any other court to become a party to a fraud." 244 F. at page 722. We believe it is more essential to preserve the integrity of the courts than to terminate particular litigations. So long as there remains anything which a court can do in a particular litigation to protect its integrity, we think it has the power to act: provided only, that such action is based upon a full opportunity for hearing by all interested parties.

■■ The companies make another attack upon the power of this court to take any action whatsoever in these proceedings. This contention is thus stated: "This is a three-judge Court and, as a three-judge Court, it has no jurisdiction over such a proceeding" (Suggestions of Plaintiff Insurance Companies in Support of their Motions for New Trial, p. 34).

The supporting argument is that (for the same reasons that a single judge has no jurisdiction in a case within the "three-judge" statute (28 U.S.C.A. § 380) such a statutory court is "without jurisdiction to try or decide a case *not* coming within the Statute; as, for example, an action to set aside a decree obtained or induced by fraud. The fact that a challenged decree was entered by a three-judge court makes no difference. It is a decree and nothing more, regardless of whether it was rendered by a one-judge court or a three-judge court" (same, p. 34).

Such a statutory court is certainly nothing more than a District Court with personnel enlarged by statute in the particular kinds of litigation defined by the statute. The purposes of the statute were to pro-

vide adequate hearing and full deliberation by three judges and, thus, to prevent a single judge sitting on the district from improvidently granting injunctions interfering with the operation of State law. Cumberland Telephone & Telegraph Co. v. Louisiana Public Service Comm., 260 U.S. 212, 216, 43 S.Ct. 75, 67 L.Ed. 217. Such suit is filed in the District Court and even a single District Judge may issue a restraining order. There is no suggestion, in the statute or in the effect intended by the statute, that the statutory court lacks any ordinary powers of a District Court which may be found useful in performance of its duties—least of all that such court lacks the ordinary and basic powers of a court of equity to protect both the parties and itself from fraudulent imposition directly affecting the litigation before it. The decisions (such as Wilentz v. Sovereign Camp, 306 U.S. 573, 59 S.Ct. 709, 83 L.Ed. 994) relied upon go no further than that only the classes of litigation set out in the statute are within the jurisdiction of the statutory court. They do not even hint that, once having that jurisdiction properly, such a court cannot exercise all of the ordinary equitable powers of a District Court in respect to such litigation.

■■ A good method of testing the verity of a contention is by examination of the results which would flow from it. If this contention be true, some of the results therefrom would be as follows. The most outrageous fraud upon parties and even the grossest misuse of the powers of such statutory court might be induced—even through serious criminal acts—by another party and there would be no possible power in the court either to prevent or to annul the nefarious results so brought about. This is true because no single judge—even of the same court—has any jurisdiction to act except to grant a brief restraining order (Cumberland Telephone & Telegraph Co. v. Louisiana Public Service Comm., 260 U.S. 212, 43 S.Ct. 75, 67 L.Ed. 217; Ex parte Metropolitan Water Co., 220 U.S. 539, 31 S.Ct. 600, 55 L.Ed. 575), and if the statutory court has no power, then there is no such power anywhere. Also, we must adopt the view that when Congress required three judges to sit in certain classes of very important and often far-reaching litigations, it had as one purpose the denial to such court of the ordinary powers, possessed by and fundamental in every court of equity, to protect

itself and litigants before it from fraud and imposition respecting such litigation. Clear expression of such purpose would have to appear in the language of the act before any court could even seriously consider attributing such intention to the Congress.

### (b) Limitation of Jurisdiction.

The discussion as to the next preceding heading has had to do with the several contentions of the companies that this court had no jurisdiction to affect the decrees in any manner—at least, by the kind of proceeding here. We pass to another contention (presented in the answers to the show cause orders) which is that the only powers in the court are (1) to vacate the decrees in entirety and determine the cases on the merits, *provided,* the Superintendent shall *first* restore the status quo before the decrees were entered; or, alternately, (2) to leave the decrees wholly undisturbed.

In limine, it is well to settle the doubt[2] in the minds of counsel as to the status of the decrees (of February 1, 1936), as affected by the present proceedings, *up to* (just before) entry of the orders at which these motions for new trials are aimed. The status of the decrees was undisturbed prior to the orders requiring distribution of the returned funds to the policyholders. It is true the funds paid (under the decrees) to the companies and to the trustees were ordered returned to the custodian but that action was purely preliminary for the purpose of creating a situation where the court could readily and efficiently act upon whatever its determination might thereafter be as to the merits under the show cause order. Such return for that purpose was acquiesced in by the companies with the reservation of right to contest what such determination should be.

The instant contention has to do with such determination and is one of the issues therein. This issue has to do with the *powers* of the court. It is that, unless and until the Superintendent fully restores the status quo before the decrees were entered, the powers of this court are restricted solely to return to the companies the monies they have returned to the custodian, leaving the decrees undisturbed. By such status quo, the companies mean the return to the custodian, by the Superintendent, of more than $2,000,000 (the 20% under the decrees) paid to over 3,000,000 separate policyholders and of nearly $600,000 paid by the trustees (out of the 30% going to the trustees under the decrees) to the Superintendent for his expenses and attorneys' fees (Brief for the Fire Insurance Companies (p. 64) filed on the merits in these proceedings). The companies know very well that it is utterly impossible for the Superintendent to restore these funds even if he wished to do so. Therefore, the legal situation created by this contention (if well taken) when applied to the actual and known fact situation is that this court can do nothing to disturb the decrees—must, indeed, order the return to the companies of the monies paid back to the custodian by them. If we are right in holding (as we do) that the companies are legally responsible for "unclean hands" in securing the decrees, the result is that they will secure the full fruits of such improper action and a grave imposition upon the court cannot be remedied. This would be a sorry result. It would even be in conflict with the much

---

[2] In their "Memorandum for Insurance Companies", filed June 24, 1939 (shortly after filing the answers), counsel expressly assume the decrees are not vacated—they say a distribution to the policyholders of the funds returned to the custodian by the companies "would necessarily require this Court to ignore, and in effect, to set aside, the decree of February 1, 1936" (p. 2).

In their much later brief filed upon the merits after the report of the master in these proceedings, they say "The February 1, 1936, Consent Decree has been vacated and set aside in toto" (p. 63) and "The Decree having been set aside in toto—whether by consent, or by this Court's assumed judicial power to do so, to the exercise of which power all the companies have *expressly* consented, and Superintendent Lucas has *apparently* consented—the Decree *is* set aside (see Superintendent Lucas' original 'Memorandum for Defendant Lucas,' p. 7). The 66 cases (with $3,001,482.74 'impoundings' therein) are now in this Court, and undisposed of—exactly as they were *before* the Decree was entered" (p. 65).

In their last brief, in support of these motions for new trial, they say "It will thus be seen that the dismissals of these cases effected by the Decree of February 1, 1936, have never been set aside. The Superintendent of Insurance did not ask that they be set aside; but, on the contrary, by necessary implication, he asked that they be left in full force and effect" (pp. 31, 32).

934

emphasized willingness of the companies to take no benefit from the bribed settlement and the resultant decrees. To hand back the funds with the reservation that they must be returned to them unless certain conditions—known to be impossible of compliance—are complied with is an idle gesture.

The related arguments in support of this contention are (1) the failure to restore or offer to restore—"the retention"—of these sums "is a fatal bar to the Superintendent's right to have the decree set aside" (citing Grymes v. Sanders, 93 U.S. 55, 62, 23 L. Ed. 798; Henry v. United States, 3 Cir., 46 F.2d 640, 642; Ripley v. Jackson Zinc & Lead Co., 8 Cir., 221 F. 209, 211, 213; and Black on Rescission and Cancellation, secs. 539, 541, 563)[3] (Brief of the Fire Insurance Companies on the merits, p. 64); and (2) that, by "retaining" these sums, the Superintendent has, in law, elected to ratify the decrees even though they may have been voidable because of fraud (citing Kentucky-Tennessee L. & P. Co. v. City of Paris, 6 Cir., 48 F.2d 795, 800, 801; Bruguiere v. Bruguiere, 172 Cal. 199, 155 P. 988, 989, 990; Ann.Cas.1917E, 122; Mallory v. Mallory, 160 Ill.App. 471 (should be 417) (same brief, p. 64).[4]

These arguments are not convincing and the cases cited are not applicable. The underlying defect in the arguments is that counsel confuse two maxims of equity. They seem to be considering the maxim "He who seeks equity must do equity." That maxim is not involved here. These proceedings rest upon the maxim as to "unclean hands". While situations arise where either or both maxims, as well as other maxims, might apply; and therefore some confusion is present in the decisions, nevertheless, these two maxims have cardinal differences. Goble v. O'Connor, 43 Neb. 49, 61 N.W. 131, 134; 21 C.J. 178, § 157 and citations, and 182, § 164 and citations; 1 Pomeroy's Equity Jurisprudence, 4th Ed., pp. 737, 738. The vitality of each, since ancient times, undeniably proves some differences. The difference of importance here is as follows. In applying the maxim requiring equity from one seeking equity the court is concerned primarily with the rights and duties of the parties inter sese. In applying the "clean hands" maxim the court is concerned primarily with protecting its own integrity from improper action by a party. The former arises upon the pleading of a party (usually defendant) against whom a fraud has been committed. The latter need not be even pleaded; may come to the attention of the court in any way; and the court will act sua sponte. Bentley v. Tibbals, 2 Cir., 223 F. 247, 252; Primeau v. Granfield, 2 Cir., 193 F. 911, 913. Even when the matter is brought to the at-

[3] The Grymes case is that one who remains silent after discovery of fraud in making a contract and treats the property secured by him under the contract as his own, will be held to have waived the fraud and will be bound by the contract and that equity is "reluctant to rescind, unless the parties can be put back in statu quo." The Henry case is that when a property owner accepts the award in condemnation proceedings he cannot thereafter question the validity of the law under which the condemnation was had; and that failure to return or offer to return the purchase price by a plaintiff does not accord with the maxim of "he who seeks equity must do equity." The Ripley case is that one entitled to rescind a contract because of fraud must act promptly and unequivocally upon discovery of the fraud. Of the Black citations, sec. 539 deals with "What constitutes knowledge or notice and how acquired" in relation to rescission of contracts; sec. 541 deals with "What constitutes laches" in respect to rescinding contracts; sec. 563 deals with "Election once made is final" in respect to rescission of contracts and states that one who continues to treat property obtained by a contract as his own after he has knowledge of fraud as to the contract loses his right to rescission.

[4] The Kentucky-Tennessee L. & P. Co. case is that a defrauded party loses the right to rescind and affirms a contract where "it not only unduly delayed rescission, but it continued to accept benefits [payments] under the contract." 48 F.2d at page 801. The opinion states that the defrauded party must promptly elect to affirm the contract or to "repudiate and demand such restoration of the former status as the then developed situation permits." 48 F.2d page 800. The Bruguiere case is that remarriage of a wife estops her from thereafter setting up the invalidity of a divorce decree obtained by her first husband. The Mallory case is that a consent decree of divorce in favor of a wife will not be set aside after her death merely to enable the husband to share in her estate.

tention of the court by a pleading, the court acts "not out of any regard for the defendant who sets it up, but only on account of the public interest." McMullen v. Hoffman, 174 U.S. 639, 669, 19 S.Ct. 839, 851, 43 L.Ed. 1117.

In these proceedings, the matter of "unclean hands" is brought to our attention by the Motion for Citation. That motion set forth a situation of the grossest imposition upon this court through inducing entry of decrees upon an arrangement based upon bribery. In all movement thereafter, this court was acting not for the benefit or punishment of any party but to do whatever the law and the facts justified in vindicating its integrity as a court of justice. We must and did take the situation as it then was and therefrom worked out that vindication in the only way possible—by taking from those we thought legally responsible for this imposition all fruits of such action.

This court is not barred from doing this by failure of the Superintendent to restore or offer to restore the payments to the policyholders and the payments to him for expenses and attorneys' fees if the Court of Appeals of this Circuit is right, as we think it is, in stating "that there is and can be no law or practice which would compel a * * * court to become a party to a fraud." Zeitinger v. Hargadine-McKittrick Dry Goods Co., 8 Cir., 244 F. 719, 722.

The case of Vallery v. Denver & R. G. Railroad Co., 8 Cir., 236 F. 176, has a bearing upon this urged necessity for restoration. Vallery, as receiver of the Colorado Midland Railway Company, brought an ancillary proceeding for the benefit of general creditors, inter alia, to set aside a sale to the Denver and R. G. Railroad Company of stock owned by Midland in a third company. The pleaded ground for this relief was that the Denver had secured this stock, much below value, through exercising its control over Midland by a fraudulent scheme involving creation of mortgage indebtedness by the Midland and foreclosure sale thereunder. As to the contention that the receiver must restore the purchase price paid by the Denver for the stock, the court (236 F. at pages 181, 182) said: "This is not a case where equity would require the plaintiff to make a tender in money of the amount paid by the Denver & Rio Grande at the fore-

closure sale of the stock. Fraud is alleged, and the plaintiff is but an officer of the court seeking to obtain property belonging to the Midland Company for the benefit of its creditors. To require the plaintiff to make a tender might defeat the action. When a plaintiff seeks to set aside a transaction for fraud, it is not necessary or his duty to tender any sums which it may appear that the parties guilty of the fraud have disbursed."

If restoration is not required as a prerequisite to recovery in an action between parties to set aside a fraudulent sale, where the plaintiff is required to do equity, so much the more is it not necessary in an "unclean hands" proceeding where the court is not acting for the parties but to protect its own integrity. The decrees here provided for payment to trustees *for the companies* of 30% of the impounded funds and it was from this trust fund that the payments were made to the Superintendent for expenses and attorneys' fees—thus these payments were such as "the parties guilty of the fraud have disbursed."

Another argument is that "When the impounded moneys received by the companies were restored to the Custodian, everything which had been accomplished by the decrees had been undone. It then became the duty of·the Court to determine who owned the impounded funds according to law and justice (Morgan v. United States, 304 U.S. 1 [58 S.Ct. 773, 999, 82 L.Ed. 1129] [counsel probably intended to cite United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211])" (Suggestions of Plaintiff Insurance Companies in Support of their Motions for New Trial, p. 35).

This argument is unsound for two reasons. First, it is based upon the unreal assumption that the restoration by the companies opened or vacated the decrees. No such result followed since the sole purpose of such restoration was to place those funds in control of the court for whatever determination it might thereafter reach upon the issues raised in the show cause proceedings. Second, counsel again lose sight of the character of these proceedings as being in vindication of the integrity of the court. Let us suppose that, *before* the decrees had been entered, this court had discovered the companies had been guilty of some sort of unconscionable conduct

*before* these suits were filed so that even counsel would have conceded that action under the "unclean hands" maxim was proper. In such situation, this court would have had to use the remedy (at the basis of the maxim's doctrine) of dismissing the suits. What could the court have done—and it must do something—with the then impounded funds? Is it compelled to try the merits of the suits solely in order to dispose of the funds? If so, a possible result would be the handing over to the companies of these funds. Is it not absurd to say that the cases could be thrown out of court without decision on the merits as to the order of rate reduction by the Superintendent—the only purpose of the suits—and yet, because the court impounded funds purely pendente lite on the insistence and for the protection of the companies (funds taken from policyholders above the only then legally established rates) and must dispose of such impoundments on dismissing the suits, that the court must proceed to try and determine the merits of the suits in order to get rid of the impoundments? Suppose the companies had voluntarily dismissed these suits before decrees entered, would the court have to try and determine the merits of the suits before it could dispose of the impoundments?

The Morgan case, 307 U.S. 183, 59 S. Ct. 795, 83 L.Ed. 1211, and other like cases announced rules as to disposition of pendente lite impoundments upon far different situations to the one here. Those cases have clearly no application whatsoever to our situation.

### (c) Conclusion.

We conclude that there is no merit in any of the attacks upon the jurisdiction of the court to act in these proceedings and, upon the facts as we view them to be, to act as we have done.

There is another feature in these proceedings which we think it well to notice in connection with these contentions as to jurisdiction. We do this because that feature is much stressed by the companies and because its force is affected by such contentions. This feature is the reiterated and emphasized claims that the companies want no benefit from these bribery induced decrees and that such attitude is evidenced by their prompt repudiation thereof and prompt return of the funds paid to them and (for them) to the trustees thereunder.

The bribery transactions were brought into the open through a grand jury investigation, at Kansas City, Missouri, in the early part of 1939. In connection with such investigation, subpoenas were issued for some presidents of the companies who promptly notified the United States Attorney (in charge of the investigation) that they would give him every assistance (Rec. I, p. 492) and, we assume, that they did so. Then followed an interval of several months with no movement by any of the companies to bring the situation to the attention of this court nor to return any moneys. We do not state this by way of criticism, for there may have been justifiable reasons for such inaction. However, it is the fact that nothing in that direction was done by the companies until the hearing upon the Motion for Citation filed by the Superintendent of Insurance. What has been stated above as to the situation *before* that hearing is merely preliminary. Our immediate concern is with what has happened beginning with that hearing, which was on May 29, 1939.

That hearing was for the purpose of determining what steps the court should take concerning this motion of the Superintendent. At that hearing there was no slightest suggestion as to any lack of jurisdiction in the court concerning entertainment and determination of these proceedings.[5] As a result of that hearing the restoration order and the show cause order were entered in each case. There was no

---

[5] After counsel on each side had stated their respective positions, members of the court sought to clarify such by questions. As to the companies, there occurred (typewritten transcript of the hearing, pp. 21–26) the following:

"Judge Stone: Let me ask you, Mr. Bullett: your proposition on the part of the companies to return the money, was that under the understanding that the Court might, if the evidence and law justified, make distribution of the returned money to the policyholders and dismiss the actions at the cost of the respective companies, or was it something else? I am asking so that we may be clear as to our understanding.

"Mr. Bullett: My advice, and that is what the companies are following, was when they found out about April 9th that there was reason to believe and for the first time reason strong enough to give

objection nor opposition to the making of either of such orders. Thereafter, the companies urged the above-discussed total lack of jurisdiction and continue to insist thereon.

In this situation, the matter which we wish to notice is the bearing of these jurisdictional contentions upon the insistence of the companies that they wish no benefits from the decrees. We are not think-

---

them, when the indictment came out, to believe it was true that they ought to lay the matter before the Court without waiting for the trial, and submit to the Court to do anything that the Court thought proper about that order. That did not, of course, carry out or apply what the decisions might be, consent as to this, that or the other issue. That was not done on the 11th or 12th of April, or about that time, because it was believed on advice that it might interfere with the criminal proceedings, and was to be put off until the day after they were disposed of. That is the reason we are here today.

"One thing I feel sure, although I have not any advice on the subject so far from the companies, but I cannot imagine that the companies would consent today to anything that might by implication seem to indicate that the action of the Court was based on their admission that they knew or had the remotest suspicion that any of the money that went from Street went to O'Malley in any way whatever. What I propose to say to the Court is that whatever the Court thought ought to be done with respect to an order which was perfectly clear that the defendant in the suit had received money for consenting to the decree, the Court should act on that, and that they were prepared without contesting anything to pay back into Court whatever the Court thought under those circumstances out [ought] to be paid back into court. That, of course, involves, as your Honors will see, a number of questions that I am not prepared to argue, because I am not familiar with all of the facts, but I understand, for example, that they paid $500,000 to the state's lawyers and $200,000 to the Insurance Commissioner or the State of Missouri for their expenses, and things of that kind. They are matters that come along. One thing the companies wanted to make clear to the Court was that we when, without their knowledge, O'Malley got money, gave his consent to the decree, that the companies do not want to take the slightest sort of benefit under the order that was obtained by the companies from the Court under those conditions, even though it involves paying back any amount of money that the Court decides under those circumstances it ought to pay back. But we assume that the Court will consider that order, these va-

rious subsidiary questions that arise under such a condition in carrying it out. That is the position of the companies. Of course, I would not argue all of the questions that arise that my friend on the other side has suggested, but if I understood him, he was suggesting that because of this O'Malley situation he would like to have set aside certain parts of the order and leave certain parts in, and I do not know whether that is what he meant or not, but that is my understanding of what he meant. The companies want the Court to enter such orders with respect to whatever they got out of that order in the way of a refund as the Court thinks they ought to pay back, and they are ready to do it. Now, in carrying that out, there are a number of questions that I suppose upon more careful deliberation would have to be discussed in determining to carry out whatever decision the Court might reach on that subject. That is their position. I do not know whether that covers the Court's question.

"Judge Stone: Yes, the members of the Court were desirous of being sure that there be no misunderstanding between the Court or between counsel or counsel and the Court as to the position of the parties here this morning, and I think that is clear.

"Mr. Bullett: Have I made that plain now to the Court? Of course, the companies are not undertaking to concede in the slightest degree that the order should be set aside because of any fraud perpetrated by the companies, but because they have learned that the defendant in the suit was paid money and, therefore, entered into this agreement. Neither are they conceding that their suit was wrong in the first place or that the rates should not have been raised. They are not saying anything about that. We are just leaving that for the future. All they are doing now is to say that they got under that order.

"Judge Otis: General Bullett, I would like to be a little more clear as to one thing, and Judge Stone has suggested that I ask you a question: do we understand you have conceded that [if] it should be the view of the Court, after consideration, that this money should not only be restored to the custodian, but should then be distributed to the policyholders and the bills dismissed? Do you

938

ing of their *right* to present such contentions. We are thinking of the patent inconsistency of their two positions. They hand back the funds saying with one breath we want no benefits from the decrees and, with the next breath, you have no power to affect the decrees by which we received these funds. Clearly, if the court cannot affect the decrees, the only thing it can do is to hand back the funds so returned. The practical situation thus developed is: take back the funds, we want no benefit from the decrees, but all you can do is to hand us back these funds —such funds being the sole benefits to them from the decrees. The willingness to return the funds would seem to be an idle gesture and none too graceful at that.

## II. Errors in Opinion.

In the Motions for New Trial there are twenty claimed erroneous statements in the opinion.[6] In the printed suggestions filed some time later than and in support of the motions, counsel claim seventy-two erroneous or inaccurate statements in the opinion. In a still later "Outline of Mr. Bullitt's Oral Argument", counsel set forth about 120 claimed erroneous, inaccurate or criticised statements in the opinion.

 We might well dispense with any consideration of this character of criticism of the opinion on the ground that statements of fact contained in an opinion cannot be used to ascertain the evidence or the facts or to control or modify the findings of fact upon which a judgment or order is based. Loeb v. Columbia Township Trustees, 179 U.S. 472, 482, 485, 21 S.Ct. 174, 45 L.Ed. 280; Stone v. United States, 164 U.S. 380, 383, 17 S.Ct. 71, 41 L.Ed. 477. Also, we might dispose of them shortly by stating, what is true, that none of such as are either erroneous or inaccurate was material in reaching the ultimate facts upon which our decision is based.

However, we prefer to do otherwise. We do this with the hope that an examination of these various contentions may be of some aid to a reviewing court, because this entire litigation—of which the present proceedings are but a part—is so complicated in many ways that it is not easy for a court, not intimately and long connected with it, to escape confusion.

In so doing, we have no thought of following counsel through the fine toothed combing and recombing resulting in the 72 criticisms in their printed "Suggestions" in support of the motions or the about 120 criticisms in the later "Outline of Mr. Bullitt's Oral Argument". We have carefully studied and considered every one of the additional matters set out in the above suggestions and outline and find no reason, in any or all of them, to grant any of the Motions for New Trial or why they should be discussed in detail. It is fair to assume that the major defects counsel claim to have found in the opinion are stated in the Motions for New Trial, which are the only pleadings before us requiring determination. Therefore, we shall confine

---

concede that the Court should do that, and do you ask a hearing upon that matter?

"Mr. Bullitt: Yes, I should think—that is not a matter that was in the purview of my advice to them. I had not thought about that part of it, but I should have thought if this Court felt that this order had been entered—it was a consent decree where the defendant was assuming to represent interest of the policyholders and had been paid in some way money for that consent, that you set that aside—then the Court would have been faced with a number of questions. First, those questions would be first. Should we now go ahead and decide the question on the merits and determine what the merits of the case were, or whether you should decide for some reason that you would feel that you need not decide the merits but would dispose of the fund

that you ordered back or voluntarily paid back, either with or without a hearing? Of course, the companies were not conceding that in paying the money back that the Court ought to just pay it back to the policyholders. That is further along.

"Judge Otis: That is the thing we wanted to have you answer that was not clear.

"Mr. Bullitt: The thing the companies wanted to do was, having drawn money out under that order from the fund in the hands of the Court, under those conditions, they wanted to restore it for whatever the Court then decided ought to be done with it."

6 References in the motions are to copies of the opinion printed by the companies. In this printed copy there are unintended inaccuracies but none of these is at all material.

discussion to such matters as are stated in those motions.

As to the erroneous statements in the opinion claimed in the motions, an initial word may be said. This immediate litigation (disposition of that portion of the impounded funds returned by the companies) is an exceedingly complicated matter in itself because it involves the conduct of many individuals and the effects of such conduct upon the separate rights of more than 130 different companies operating as 57 different groups. The evidence covers more than 1,600 printed pages. A report on the evidence by the master could not be reduced to less than 678 printed pages. In addition to such difficulties, this immediate controversy is not entirely isolated. It is, in a sense, a link in a chain of disputes and litigations regarding Missouri insurance rates which has stretched unbroken for eighteen years —related to the general litigation. While not necessary to a determination of the immediate issues, we thought some references to this general situation might be useful to a reviewing court, as a matter of background if nothing more and, therefore, such were included in the opinion. In this situation, it would be unusual if some inaccuracies of statement did not occur in our regrettably but necessarily lengthy opinion.

In the Motions for New Trial (p. 1) it is stated that, if the claimed erroneous statements of fact had been correctly stated, they "would, have, or might have, had a material effect upon the Court's reasoning and conclusions adverse to the plaintiff." Therefore, in examining these claimed inaccuracies, our concern is not so much with the existence of inaccurate statements of fact as it is with·the *materiality* of such as may exist. By "materiality" we mean as having any material influence upon the factual results reached in the opinion and in the findings of facts. *Very generally stated, the main factual results reached in the opinion and in the findings were as follows: the nefarious conduct of Street; the agency of Street; and the knowledge (implied or actual) of the companies. With this measure in mind,* we turn to the several items in the motions.

The claimed inaccuracies refer to separate brief statements scattered throughout the opinion. To consider each separately is, therefore, a rather disjointed method but there seems no other way open to us.

Hence, we will consider each separately stated matter (in the motions) as a distinct item except where, (because of like subject matter) we are able intelligently to cover several by the same discussion.

## Item I.

This item charges that the statement in the opinion (p. 1), (38 F.Supp. 898) that one of the provisions of the settlement agreement was that "the suits were to be dismissed" is erroneous. It is true that the agreement does not use the expression: "the suits are to be dismissed". However, it does set forth, as one of the main purposes of the agreement, "the mutual desire of the parties to settle such controversies" (Rec. I, p. 28). That the parties to the agreement understood that such "settlement" involves dismissal of the suits is clear. This was shown to be true when they first brought this matter to the attention of the court (about a month following the agreement) in separate verified motions for decrees wherein the several companies stated "the parties to this cause have by mutual agreement *settled* said cause and controversy involved therein, including the distribution of the funds impounded with the court under its order *and for a dismissal of this cause*" (italics added). In substance, the statement in the opinion was true. More important and controlling is the obvious situation that, whether erroneous or true, the statement had not the remotest influence upon the results reached in the opinion. It was so entirely immaterial that it could have been omitted without being missed. It is not and could not be disputed .that the decrees (including dismissal) were the direct and the intended result of the agreement.

## Item II.

This item is not directed at any inaccuracy of statement in the opinion but at an inference, which counsel draw, that the language quoted in the item from the opinion might be construed as meaning that six of the companies had contributed to the bribery money. This statement in the opinion occurs in part "II. *Contentions*" of the opinion. This part of the opinion was, obviously, designed purely as a general statement of the "Contentions" of the parties before this court in this proceeding. In the brief filed by the companies on the merits, it is stated (p. 45): "The 139 Companies .fall into four 'classes' accord-

ing to the differences in information which they respectively had; and they will be so discussed:

First Point 66 Companies (p. 48, infra)
Second Point 13 Companies (p. 91, infra)
Third Point 34 New York Companies (p. 94, infra)
Fourth Point 26 Hartford Companies (p. 101, infra)

Total 139 Companies."

On the next page of the brief (p. 46) is a "Summary of Points Discussed" whereunder is the same grouping of companies as above. The statements in connection with these four groups (brief, pp. 46–47) clearly show that a prime reason for putting the New York and the Hartford companies in classes different from the 66 companies was that the New York and Hartford companies had participated in the New York or in the Hartford meetings at which the *initial* bribery money was arranged for. The statement in the opinion now criticised in all respects follows the substance of the statements in the brief of the companies as to the general "contentions" of the companies and it is obvious that the opinion (at this point) was stating merely the general contentions.

The contentions in the motions (under this item) concerning contributions to bribery money by the six companies will be treated under Item XII which deals with the same matter.

### Items III, IV, XIV, XV, XVI.

These are claimed to have to do with an erroneous statement as to the date when the 155 suits (the *original* separate company suits in this court) were dismissed.

The opinion (p. 11), (38 F.Supp. 903) states this date as "In May, 1929 (soon after the affirmances) * * *." The "affirmances" were by the opinion of the Supreme Court (National Fire Ins. Co. v. Thompson, 281 U.S. 331, 50 S.Ct. 288, 74 L.Ed. 881), which was handed down April 14, 1930. It is obvious this statement should have been "In May, 1930". This inadvertence is argued to have been important in the determinations reached by this court. The only statements in the opinion based on this erroneous date are those to the effect that, for several months during the dispute over Missouri rates, the ten percent reduction rate order was unchallenged (Op. p. 11), (38 F.Supp. 903) and that, shortly after the above affirmance, all of the 155 suits were dismissed (Op. pp. 48 and 49), (38 F.Supp. 919). Whether such order was or was not challenged in 1929 or in 1930 or at all has no bearing whatsoever upon the issue of "unclean hands" through conduct of the companies in 1935 and 1936. Whether these 155 suits were dismissed in May, 1929, or in May, 1930, has, obviously, no bearing whatsoever upon the issues determined in the opinion or upon the reasoning by which the results in the opinion were reached.

As to Item XIV it may be noticed that the erroneous statement attacked is not in the opinion but in the bracketed expression interpolated by counsel into the language of the opinion. When taken in connection with the next preceding sentence in the opinion (p. 48), (38 F.Supp. 919), it is clear that no specific date was in mind or was material. When Items XV and XVI are read in the context of the paragraph (Op., pp. 48–49), (38 F.Supp. 919) containing them (as well as Item XIV) the strained character of these criticisms is clear.

### Item V.

In a sentence of the opinion (p. 13), (38 F.Supp. 904) and the footnote thereto is the statement that by 1939 all distribution of the impounded funds to the companies and to the trustees had been made. Counsel correctly challenge this statement. They state "This is incorrect, because, in 1939, there remained at least $941,240.52 *undistributed* to the Companies and to the Trustees, i. e., (1) $613,918.21 out of the impoundings alone; and (2) $327,322.31 out of the interest and accretions going to the Companies." They say: "This error is adverted to because (a) the Opinion refers to the Companies' failure to demand an accounting of Street (pp. 59, 60), (38 F.Supp. 924); and (b) our argument, which the Opinion evidently overlooked, that the time for an accounting had not arrived until this $941,240.52 was distributed and the Custodian's accounts closed (brief, p. 58)" (Motions, p. 4).

The point of the criticism as to this item is based upon the asserted premise that "in 1939, there remained at least $941,240.52 *undistributed* to the Companies and to the Trustees, i. e., (1) $613,918.21 out of the impoundings alone; and (2) $327,322.31 out of the interest and accretions going to the Companies" (Motions New Trial, p. 4). On this basis is built the contention that this court overlooked the ar-

gument in the brief on the merits (p. 58). We did not overlook this argument in the brief. We considered it but we did not discuss it in the opinion. This lack of discussion might well lead counsel to the conclusion that we had overlooked it. We think we should now remove this impression and state our views.

This argument (in the brief), which counsel think we overlooked, was that "The failure to receive Street's promised accounting, for the comparatively small [5%] sum involved for each Company, excited no suspicion, because the time for such accounting had not arrived"—meaning, there was no reason to expect an accounting "until * * * the accounts of the Custodian and the Trustees could be finally closed up" after all moneys in the hands of the custodian and of the trustees had been distributed. The pertinence of this argument is in the contention of the companies, as follows: if Street had, at the time any company was asked for the 5% contribution, lulled inquiry as to the intended use thereof by promising an accounting after the custodian's distributions and accounts were closed, then no unfavorable inference could be drawn from failure of the company to demand such accounting until the time therefor arrived, which has not even yet occurred. This contention is not simply that there would—naturally—be an accounting by the custodian at the close of his services but it has to do solely with the state of mind of the officials of any company (at the time the 5% payments were made) induced by the claimed promise of Street that he would make an accounting of the use of the 5% contribution at a particular time, that is, *after the accounts of the custodian had been closed finally*.

Before discussing this "argument" in the brief, it is useful to examine just how far the statement that "there remained at least $941,240.52 *undistributed* to the companies and to the Trustees" is accurate. That the custodian had this sum is true. The point is how far, or in what sense, can this sum be properly regarded as a fund belonging to the companies or to the trustees, and, therefore, *"undistributed"* to them. This requires explanation of the purpose of and the component elements of this fund of $941,240.52, which was in the hands of the custodian as of January 1, 1940.

Why such a fund? Mainly to provide money for expenses of the distribution to the policyholders of the portions of the impounded funds going to them under the decrees. Such distribution required the calculation of several million different amounts for each of which a check must be issued and mailed to the particular policyholder. It was obvious that these and related matters would involve a vast amount of labor extending over much time. Also, that there would be a very sizable resulting expense which could not be even approximated when the decrees were entered. An ample fund must be provided therefor. This was done, by the consent decrees, and is the fund now being considered.

How was this fund composed? It came from two sources: (1) such part of the earnings made by the custodian, from investing the impoundments, as were allocable to the impoundments not going to the policyholders; and (2) what we will call "retained impoundments".

"Retained impoundments" necessitate some explanation. Under the settlement agreement, the companies filed new rate schedules retroactively effective May 1, 1935, and impoundments were to cease as of April 30, 1935. For reasons not necessary to be detailed, the impoundments were continued until November 11, 1935, although business written beginning May 1 was regarded as being under the new rates. Since the "forthwith" disbursements to the companies and to the trustees provided in the decrees were only of 50% and 30%, respectively, of the net impoundments on business written before May 1, 1935, the impoundments on business written beginning May 1, 1935, were retained by the court. Such created the greater part of the "retained impoundments". The remainder of the retained impoundments was made up of what, for want of a better name, we may call "equalizing amounts". The total of these "amounts" is so relatively small ($16,454.98) that we are not justified in taking space to explain why they came into being. For present purposes, it suffices to say that if the impoundments of any company on business written between May 1 and November 11, 1935, fell below 5% of the total net impoundments of that company, the deficiency to make up the 5% was supplied by retaining the required amount from the 50% of net impoundments (up to May 1) "forthwith" payable to that company. Thus these "retained impoundments" of $613,918.21 were made up of

942

$597,463.23 of impoundments on business written between May 1 and November 11, 1935, and of $16,454.98 of "equalizing amounts".

The results were (1) that all companies not affected by the 5% requirement received "forthwith" (during 1936) payment in full of the 50% of net impoundings on business written up to May 1, 1935; and 36 companies and two participating accounts (Underwriters Grain Association $161.88 and General Cover Department $236.47) received such 50%, less amounts varying from $2,473.72 to $24.38 and totalling for the 38 accounts $16,454.98. The information as to the "equalizing amounts" is, with one exception, derived from the books of the custodian and is attached to this opinion as an appendix. The above exception is a "breakdown" of the General Cover Department % 903—shown in the Record III, p. 531.

The decree required the "earnings" portion of this fund to be exhausted before resort to the "retained impoundment" portion.

Thus from 1936 up to the time of the refund by the companies on July 1, 1939, the situation was that the custodian held only the trust fund for the policyholders (provided by the decrees Rec. I, pp. 34–35) which had been steadily paid out to them until practically completed by July 1, 1939 (Rec. III, pp. 533–534); and this expense fund for meeting those and other expenses and costs. Whether this expense fund would be exhausted or how nearly so could not be known until after full distribution and the time had arrived for the custodian to be discharged.

From what has been said, it is clear that the statement in the Motions for New Trial that this expense fund was *"undistributed* to the Companies and to the Trustees" is accurate only in so far as this: that any balance left therein when the custodian was ready to close his accounts would be then so distributable in the way provided in the decrees.

██ Having explained the character of this fund in the hands of the custodian, we examine next the claim that certain companies were influenced by promise from Street that he would explain or account for the payments he was asking of them and which he used for bribery. It is not urged that all of the companies had any such promise. This contention has to do with one feature bearing on implied knowledge of each of the companies—that is, the duty to inquire and lack of inquiry—at the time each made the 5% contributions. This feature, urged by the companies, as having an important influence upon such duty to inquire and lack of inquiry, is that Street had (they claim) promised an accounting which would explain for what these contributions were wanted. The argument is that a promise of such an accounting was relied upon and, therefore, would justify these 5% payments without further inquiry. Of course, even if such promise were made, it would have no bearing upon the duty to inquire unless it was relied upon by the company. If *some sort* of accounting were promised and the time therefor passed without accounting and without some steps by the company thereafter to obtain the accounting or the information the accounting would have given, it would be fairly conclusive proof that the company had not been influenced, when it made its contribution, by the promise of an accounting. But if the time for any promised accounting had not arrived, then there could be no inference from failure of the company to follow up the promise. The sole bearing of the contention under this item of the Motions for New Trial is, therefore, that no such inference can be drawn from failure to follow up because the time for the claimed promised accounting had not yet arrived since the particular accounting promised by Street was to be after closing of the custodian's accounts and such closing has never been made.

At the threshold of such consideration, the incongruity of such contentions thrusts itself forward. Street was asking contributions which, in so far as he disclosed, were to be used for purposes already fully provided for by the trustees' fund which the companies knew had not been exhausted. He was asking such be made to him as an individual or as "Agent" and not in his capacity as one of these trustees. It was obvious that these contributions had no connection whatsoever with the expense fund of the custodian or the fund of the trustees. Then, why should Street make any accounting as to these contributions dependent (as to time) upon closing the accounts either of the trustees or of the custodian? A fortiori, why should any company official be influenced in the slightest by such character of promise? Would not the effect of such an unnatural connection

of ideas tend to arouse, not allay, suspicion and inquiry in the mind of any official giving serious consideration to an accounting? This incongruity bears not only upon the probability as to any such promised accounting but upon the influence—weight—of such a promise as an inducement to such contributions. Nevertheless, we will examine the evidence as to any promises by Street as to any such accounting.

The opinion (pp. 58–60), (38 F.Supp. 924), after setting forth the obviously unusual and inquiry—exciting situations under which those 5% payments were made, contains two statements here pertinent. The first of which was that, in spite of such situations, "these experienced company executives, with few exceptions, made these contributions without further inquiry although (the testimony shows) they required information before they would pay out money for insured losses or other company expenditures." (p. 59), (38 F.Supp. 924.) The second (and immediately following) statement was: "The few exceptions were satisfied by promises of later accountings which were never made and which they never further requested." (pp. 59–60), (38 F. Supp. 924).

From what is said above, it is clear that this contention as to accounting is rather narrowly confined to only one feature of the evidence as to the duty to and the failure to inquire. Since no promise of any kind of accounting to be made at any designated time was ever followed up by any company, the contention really narrows down to two considerations: (1) was the promised accounting of Street to take place after closing of the custodian's accounts; and (2), if so, what influence had such promise upon the contribution of the company. The last of these two considerations is pertinent because even if the situation as to this particular feature were as the companies contend, yet other evidence might convincingly show that such promised accounting had no material influence upon the action of a company in making its contribution. Obviously, this matter of promised accounting is an individual company consideration but since all of these payments (the initial bribe contribution of $100,500 and the later 5% contributions) were by groups and, therefore, all companies in a group like affected, we will make our examination by groups. Also, our examination will cover, not only the 5% payments which is the matter aimed at

in this item, but, in addition, the contributions to the initial bribe money $100,500 made in connection with the New York and Hartford meetings in May, 1935.

To ascertain as to which groups there was evidence as to any promise by Street of an accounting *to be made after the custodian's accounts were closed,* we have rechecked the entire evidence. The very nature of this onerous task is such that inaccuracies are possible but the work has been carefully done and we believe there can be no material inaccuracy in the statements hereinafter as to this situation. While we are concerned only with promises as to a particularly timed accounting, yet our search of the evidence has revealed a variety of testimony as to accountings. In avoiding confusion, it may be helpful briefly to sketch this general situation and thus, by elimination, get down to those groups as to which there is evidence as to the particular promised accounting here involved.

This general situation is as follows: As to many groups there is no evidence as to any kind of accounting, either promised or expected though not promised. As to other groups, there is no evidence of any promise of or statement that there would be any kind of accounting but the executive "assumed" or "expected" or "hoped" there would be an accounting, usually indefinite as to character or time (instances are Rec. I, 129, 134; III, 32, 33, 34, 39; II, 119; II, 233, 234, 235; II, 524, 525, 526; III, 13). As to yet other groups, there was evidence of a promise or a statement of Street that he would account at some *indefinite* time in the future (instances are Rec. I, 236, 244, 245, 246; I, 82; III, 401; III, 337; III, 76, 81; III, 48). As to other groups, there was evidence of promise or statement that the contribution to the initial $100,500 would be accounted for when the settlement had been made or when the special fund needed by Street and to which these initial contributions were "advances" was prorated among all of the companies (instances are Rec. III, 401, 402; III, 337; III, 74; II, 417, 419, 426; II, 458, 460; III, 88; III, 46)—of course, the prorata accounting was made when these initial advancements were deducted from the later 5% payments requested from these same companies. As to other groups, the evidence was that Street promised an accounting or explanation at the approaching semiannual meeting of the Western Underwrit-

er's Association[7] to be held at White Sulphur Springs (instances are Rec. II, 61, 64; II, 510, 511, 512; II, 247, 249; I, 176, 185). As to one group (making only a 5% contribution) Street stated, March 30, 1936, that explanation would be made at the Association "meeting next month" (April, 1936) (Rec. III, 259). As to one group, the executive was referred by Street to Mr. Haid for explanation and Street stated also that he (Street) would explain "the first time I see you" (Rec. II, 428) but, the executive testified, "I wasn't interested in getting them [any details] and didn't ask either one of those gentlemen [Haid or Street] for them" (Rec. II, 435).[8] The situation, set forth above in this paragraph, covers all except five groups (20, 23, 30, 43 and 45). Next, we will examine the evidence as to each of these five groups separately because such evidence contains statements which are or might be construed to be understandings that Street had promised an accounting after closing of the custodian's accounts.

 *Group 20.* The statement by the witness for this group (William H. Koop) was that Street "told me led me to believe that he was asking the companies voluntarily to contribute 5 per cent with the expectation when all the settlements [both Federal and State cases] were made, the whole thing would be washed out and all calculations made and a proper allocation of the proceeds" (I, 417). Construing this language to mean a promise of an accounting after or later than the closing of the custodian's accounts, it had nothing whatsoever to do with either the initial contribution or the later 5% contribution by this group. This is so for any or all of three reasons. First, this statement was made *after* all checks from this group had been issued (Rec. I, 419), and, therefore, could have had no influence upon such issuance. Second, Koop (to whom the above-quoted

promise was made) had nothing whatsoever to do with issuance of any of these checks (Rec. I, 414, 417). This was the group in which Street was an executive or western general manager, representing all of these companies in this litigation (Rec. I, 394, 395). It was within Street's authority to authorize these checks (Rec. I, 414); the vouchers for the checks were signed by Street (Rec. I, 398, 402); and the checks issued through Street's office (Rec. I, 417). Third, the issuance of these checks was by Street who was an active participant in all the bribery transactions. This actual knowledge was, in such a situation, the actual knowledge of this group.

 *Group 23.* This group contributed both to the initial bribery payment and to the later 5% payments, being given credit for the first payment by reduction in the later 5% payment.[9] The witness for this group was Wilfred Kurth.

Unfortunately, Mr. Kurth was not as frank at times as could be wished.[10] This lack of frankness and the somewhat disjointed character of the examination as to separate occurrences makes a careful study of his testimony necessary in order to get an understanding of the real situation.

He testified as to the New York, 1935, meeting (in connection with which the payment of $15,000 was made as a contribution to the $100,500 initial bribery fund) that Street said he wanted to raise $100,000 for legal expenses and was asking some of the larger companies to contribute that amount to save the delay and detail that would be occasioned by applying to all of the companies interested in the litigation (Rec. I, 424, 438); and that the $100,000 would be fully accounted for (Rec. I, 424–426). Then he was asked, "What if anything more was to be paid, or were you to have any of this $15,000.00

---

[7] This Association held semi-annual meetings at White Sulphur Springs in April and October. The 5% payments were solicited and most of them made in March, 1936. The meeting referred to by Street was the one to be held in April, 1936. No report or explanation was made at this or any similar meeting later.

[8] This witness testified as to this same (5%) payment that he understood that Street was to use it for legal expenses in connection with the case "and account to us in the final analysis" (Rec. II, 435).

That he either did not mean—by "final analysis"—any accounting after the custodian's accounts were closed, or that he did not give his check in reliance thereon is clear from his very next answer (Rec. II, 435).

[9] The initial payment was $15,000 and the reduced 5% payment was $28,682.14 (Rec. I, 430, 437).

[10] One example of the unresponsiveness and evasiveness of this witness is in an examination by the master beginning on Rec. I, page 444, and ending on page 446.

back? What about it?· What was the understanding at the time?" His answer was "Well, it was to be applied to expenses and that when the final clean up of the Missouri impoundings was made, it would be accounted for" (Rec. I, 426). Also, he would get a credit "in the final cleanup of the accounting" (Rec. I, 440) for this advance on any further demands (Rec. I, 440, 441).

When the $28,682.14 check was requested, Street did not say what it was for —"Just he wanted it" (Rec. I, 444). "He got it on the theory he was going to get up a *full* statement? A. Oh, yes, *by the end of the year*" (Italics added) (Rec. I, 444)—the year being 1936.

When the $15,000 check was issued on May 2, 1935, the transaction was that day entered on the regular cash book of the company as "Legal Charles R. Street Chairman Mo. Refund Case $15,000.00" (Rec. I, 448, 449). The check for $28,682.14 (dated March 23, 1936) was placed in a Special Suspense Account No. 3 which was created when the 11% check from the trustees was received and the $28,682.14 check was issued (Rec. I, 436, 447, 449). Thus the situation (as to these two payments) following the creation of this "suspense" account was as follows: When the $28,682.14 check was given he understood that this plus the earlier check for $15,000 represented 5% of his impoundings (Rec. I, 437) and that his and all other companies were giving to Street, as agent, such 5% (Rec. I, 437, 438). Since he knew then that the earlier advance ($15,000) had been asked solely to save delay in applying to *all* of the companies and that it was being credited on his later 5% payment made in connection with collections of 5% from *all* of the companies, he must have known that all of these collections were for like purposes. Also, he knew then that he was, in connection with this second payment, getting the credit for the first payment ($15,000) which had been promised in "the final cleanup". This last payment of $28,682.14 was to be accounted for in a "full statement * * * by the end of the year." (Rec. I, 444). Therefore, it is clear that such statement at the end of the year would have given all the information as to the purposes for and uses of these two checks that he claims to have expected, as to the first check, at any final accounting after the entire litigation had been completely closed. Hence the reliance

which he really placed upon these promises of accountings can be properly estimated by what he did concerning this accounting promised at the end of the year 1936.

For taxation purposes this $28,682.14 had to be accounted for to the Missouri Insurance Department (Rec. I, 450) and, therefore, it was necessary to close this "suspense" account into the regular account books of the company by the end of the year (1936) (Rec. I, 443, 445, 447, 448, 449). To transfer this "suspense" item to the regular books, required an entry therein of the purpose of the expenditure and the head accountant came to him for such information (Rec. I, 444). Without knowing anything more about what the $28,682.14 was for than he knew when he issued the check therefor (Rec. I, 443, 445, 449), he instructed the accountant to make the entry. He did this without any inquiry to Street (Rec. I, 443, 445, 445–446) or to Folonie, general counsel (Rec. I, 450) as to what this payment was for and without asking anything about the accounting or "full statement" prom-·ised by Street at the end of the year (Rec. I, 444, 445, 445–446) although no kind of statement had been made by Street. The master persistently questioned as to why inquiry was not made but his questions were steadily evaded by the witness (Rec. I, 445, 446).

We cannot believe that these claimed promised accountings had any substantial influence upon allaying inquiry as to the purposes for which these checks were issued. It is true that the witness tried to accentuate the importance to him of these accountings but his subsequent actions concerning them (as revealed by his own testimony) conclusively contradict his protestations.

His interest in this respect was confined to securing "uniformity", as to the various companies, in entry of these kinds of payments by all of them (Rec. I, 449, 450) —it was simply "an accounting matter" (Rec. I, 450).

*Group 30.* This group is composed of one company (Merchants Fire Insurance Company) of which Mr. G. N. Gardner is vice-president. This group is involved only in the 5% payments. Mr. Gardner (Junior) handled the transaction. The testimony of Mr. Gardner is convincing ·that an accounting had no material influence upon his authorization of the 5% payment by his company. The only

946

language from which it could be even inferred that an accounting was promised by Street to be made after the custodian's accounts are closed is the indefinite statement in a letter of Street that "Tell him [Gardner] full statement will be rendered when this thing is out of the way" (Rec. III, 308).

Street handled this matter through the Colorado state agent of one of the companies of which he (Street) was vice-president. He mailed a check (made to the Merchants) to this agent in a very significant letter (Rec. III, p. 308) addressed to the agent but which stated "You can show him [Mr. Gardner's father] this letter and then destroy it". In this letter was the statement "Tell him full statement will be rendered when this thing is out of the way". This letter was shown Mr. Gardner (his father being absent). Mr. Gardner's reaction was expressed in a letter to Street (Rec. III, p. 302) stating he had seen the letter from Street and saying: "I wish you could give Mr. Jessup [the agent of Street's company to whom Street had written] or myself a further explanation of the expenses referred to in your letter. With the present information, my understanding of the situation is very vague, in view of the fact that my understanding is that the legal expenses were taken care of from the impounded premiums by court order."

To this Street replied in another very significant "Confidential" letter (sent to the agent for delivery to Gardner) (Rec. III, p. 304) in which was the statement: "Due accounting will be made to the Court for the fund placed in the hands of Trustees, and similar accounting will be made *the companies for this special fund.*" (Italics added).

Gardner then promptly sent his check in a letter to the agent (Rec. III, p. 306) in which he stated, concerning Street's letter: "I have your letter of April 6 enclosing confidential letter from Mr. Street. This information is very satisfactory, and I think I now understand the situation."

Mr. Gardner was closely examined as to what there was in Street's letter which was so very "satisfactory" to him (Rec. III, pp. 310–313). This examination convinces that any sort of accounting had nothing to do with his authorization of payment. Only once (Rec. III, p. 310) does he mention accounting and that *is*

not the accounting as to *this* money (promised to be made direct to the companies in Street's letter) but the accounting to the court for the fund placed in the hands of the trustees—a matter which Street clearly differentiated (in the same sentence of his letter) from the above accounting direct to the companies.

■ *Group 43.* This group made both initial and later 5% payments. The group was composed of six companies (in the federal court litigation), which were English companies and their American subsidiaries. The manager and deputy manager in this country were Harold Warner and Harold T. Cartlidge, respectively. The testimony as to this group is from these two witnesses. Both of these men attended the New York meeting at which the initial bribe money was arranged on May 2, 1935. Warner attended the meeting in New York in March, 1936, in connection with the 5% collections.

Warner testified (Rec. III, pp. 352, 353 and 368) that Street assured there would be an accounting. This occurred at both of the above meetings (Rec. III, p. 368). The details of this testimony are as follows: At the meeting in New York (May 2, 1935) Street stated that in attempting to make a compromise of the litigation, which he thought was possible, he would need about $100,000 for legal expenses; that, rather than make a canvass of the 137 companies, he wondered if those present would volunteer a lump sum "on the understanding that in due time, of course, there would be a full and proper accounting of the whole thing, and that whatever expenses were incurred would be allotted over the whole of the companies in accordance to their interests" (Rec. III, 352). Warner got the impression "that we were going to get an accounting and he was asking this as an advance" (Rec. III, 353). It was in connection with effecting a compromise that Street talked about $100,000 for legal expenses (Rec. III, 360). At both of the New York meetings (May 2, 1935 and in March, 1936), Street gave "very definite assurance that we would get a complete accounting. I think that was mentioned, that is what I counted on, that it would be explained" (Rec. III, 368). The language, in the above quotations, is quite general; and some expressions, standing alone, might be construed as meaning an accounting at the end of the litigation. That, however, was not his

understanding. Consideration of his entire evidence convinces that the accounting Warner had in mind as promised was confined to the funds used for legal fees in connection with this settlement and that such accounting had no connection whatever with the closing of the funds of either the custodian or the trustees. In fact he knew his advance payment of $10,000 had been deducted from his 5% payment (Rec. III, 363 and Exh. 107, Rec. I, 483)—made by all of the companies—and when he received a later payment of 5% from the trustees in December, *1937,* he thought the entire matter had been wound up. His evidence leaves no doubt that his only interest was in getting any "salvage" possible from the litigation (Rec. III, 355, 362, 371) and that he was willing to leave the entire matter in Street's hands (Rec. III, 353, 362, 363) without further investigation (Rec. III, 355, 362). Clearly, the promises of accounting had no influence at all in preventing his investigation of the purposes for which Street wanted this money.

Cartlidge testified as to the first of these meetings (he did not attend the second) as follows:

"Q. 118. Now, I have before me a memorandum which purports to cover the Hartford meeting wherein it was stated, 'It is necessary in carrying on this activity to use temporarily $100,000.00 which will be accounted for when the settlement is made. We are asked to contribute our portion of this sum as shown below.' Did that happen in your meeting? A. Substantially that.

"Q. 119. So that part happened here just the same way? A. Substantially that." (Rec. I, p. 470).

"Cross Examination by General Bullitt.

"XQ.234. I will get at two questions. At the May 2, 1935, meeting at which you were present with Mr. Street, what did he say, if anything, about making an accounting of·this advance and whether it would be reimbursed later to you? A. We understood that it would be reimbursed to us.

"XQ.235. Did he say anything about making an accounting to you of the purpose for which it was devoted? A. I think not. I have no recollection of it." (Rec. I, p. 492).

It is quite clear that Cartlidge was not relying upon any accounting when he joined in signing these checks.

*Group 45.* This group was composed of a foreign company and its American subsidiary. This group contributed to the initial contributions (part of the $100,500) at the Hartford meeting (May 3, 1935) and also to the later 5% contributions. The witnesses as to this group were J. H. Vreeland (United States manager of the foreign company and president of the American subsidiary), and William H. Talcott (auditor). Vreeland attended the Hartford meeting (May 3, 1935). All of the testimony as to any kind of accounting is confined to the initial payment (resulting from the Hartford meeting). There is no such character of testimony as to the later 5% payment.

At the Hartford meeting, Street stated the desirability of and the possibility of compromising the litigation; and that he would like those present to contribute to a fund he needed (Rec. II, 463) for legal expenses (II, 464). He said "that instead of going to all of the companies he was asking those that he could reach at this trip [to New York and Hartford], and that whatever money we contributed would be accounted for in the final accounting" (Rec. II, 465). Just what the witness understood as to who was to make this indefinite "final accounting" or when it was to be made or what it was to include is not further explained in the testimony.

Whatever may have been his understanding, it is clear that, in so far as the purposes for which the money was to be used are concerned, this promised accounting had no inducing influence toward halting inquiry by him as to such purposes when he authorized this check. He relied solely upon Street's statement as to what the money was for. "The truth is that Mr. Street could have called on you for more money than that and you would have readily paid it, wouldn't you, on his assurance of what it was for? A. Yes." (Rec. II, 480).

### Item VI.

This has to do with a statement in the opinion (p. 17) that: "The expenses of all kinds for this litigation as it progressed were collected for the Subscribers Actuarial Committee through the Missouri Inspection Bureau (Paul W. Terry) from the interested companies on the basis of Missouri premiums and expended under direction of the Actuarial Committee."

The criticisms are that the funds for expenses of this litigation were not collected "for" the Subscribers Actuarial Committee nor were they "expended under direction of the Actuarial Committee". Mr. Paul W. Terry was the Missouri Inspection Bureau (Rec. III, p. 372). He testified that the funds to pay for attorney fees, filings, etc., in this litigation, were obtained by him "Through either a special or regular assessment" (Rec. III, p. 376) prorated among the companies on the basis of Missouri insurance premiums (Rec. III, p. 373). As to these expenses being paid "under direction of the Actuarial Committee", Mr. Terry testified as follows (Rec. III, p. 376):

"After the suits were filed were there certain expenses in connection with the litigation as it went on in the way of attorneys' fees? A. Yes, sir.

"Q.36. Filing, etc.? A. Yes, sir.

"Q.37. Who passed on those bills? A. The Subscribers Actuarial Committee O. K.'d all attorney fee bills.

"Q.38. Who sent the bills to the Subscribers Actuarial Committee for approval? A. The attorneys.

"Q.39. After the bills were approved by the Subscribers Actuarial Committee, by whom were they paid, if you know? A. I paid the bills."

Mr. Folonie, general counsel for the companies, testified that expense bills were directed to the Actuarial Committee (Rec. III, p. 158, 159).

From the above, it is clear that these statements in the opinion are in all respects accurate in so far as accuracy was at all necessary to the matters in mind in the opinion. The criticisms go no further than concerning precise details which were in no sense material.

The bearing of the method of collection and payment of such funds is mainly upon the situation (as to notice) surrounding and affecting the action of the New York and the Hartford companies in contributing the funds used in the *initial* bribery payment. A feature of this situation was that, in the face of the fact that the above method of caring for legitimate expenses of this litigation had been for years and then was in force, the New York and the Hartford companies contributed $100,500 to an unusual agency (Street) for use in connection with the litigation, without investigation of any reasons for this unusual procedure. That this procedure was quite un-

usual is shown by the testimony of Terry (Rec. III, p. 385) as follows:

"Q.166. But other than through your bureau and then by the trustees out of the 30 per cent fund, you knew of no money being expended for legal expenses? A. That is right.

"Q.167. And that condition—that was the fact during the entire time of the litigation from 1922 on down that you knew of no attorneys' fees or other legal expenses being paid except through assessments made by your bureau? A. I think that is true."

## Item VII.

This item deserves notice only for the purpose of not omitting it in this opinion. The statement in the opinion is conceded to be accurate but counsel is dissatisfied because we did not particularize—to an extent utterly immaterial in the opinion.

## Items VIII, XI, XIII.

█ These items have to do with three statements in the opinion (pp. 19, 32, 34) to the effect that the Actuarial Committee had sent, to the companies in June, 1935, a circular letter giving the general terms of the settlement agreement (of May 18, 1935, between the Superintendent of Insurance and Street, as agent for the companies). The motions are correct in stating that no such circular letter was sent by the *Actuarial Committee* in June, *1935*. The facts are that copies of a circular letter (sent by the Missouri Inspection Bureau to company agents in Missouri) dated June 12, 1935, were sent to the companies (Rec. III, p. 388). The circular letter sent by the Actuarial Committee was dated February 4, 1936.

Although counsel accentuate this error, it was clearly immaterial. This is obvious when the bearing of these letters on the fact situation (treated in the opinion) is considered. That situation has reference to the 5% payments made by the companies. None of the checks for such payments were drawn before March 13, 1936—more than five weeks *after* the *last* of these two letters is dated (Master's Rep. pp. 293–297). Therefore, weeks before any such checks were drawn, one or both of the above letters had carried to the companies the information that the litigations had been settled under an arrangement setting aside to trustees (Street and Folonie) 30% of the impounded funds to pay the expenses of the

litigations[11]; and that any balance, over such expenses, would be distributed to the companies. These 5% payments to Street "Agent" were in direct connection with 11% payment checks from the *trustees,* the checks representing such a balance not needed for such expenses. The point is that the companies had this information concerning the 30% trust fund provisions before any of them gave a 5% check and also then knew that the funds for such 5% payments were being then provided for by checks for this 11% unneeded balance from this trustees' fund. The exact date of the circular letter or whether it was from the Missouri Inspection Bureau or from the Actuarial Committee or from both were entirely immaterial, provided only such was *before* the companies gave the 5% checks. Indisputably, *both* letters were appreciably before such checks were even requested.

### Item IX.

 This has to do not so much with erroneous statement of fact—although one erroneous statement is claimed and correctly so—as with what counsel think might be a possibility of misconstruction by those reading this language of the opinion (p. 21), (38 F.Supp. 907.) [12] The erroneous statement has to do with a quotation mistakenly stated as being in the minutes of the Actuarial Committee for its meeting of March 19, 1935, instead of the meeting of July 9, 1935—the true date.

The entire sentence in the opinion (covered by this item) was clearly for no other purpose than to attempt to fix an approximate date—concerning which the evidence was barren—when the bribery negotiations began. The nearest the evidence fixed this date was "early in 1935" (McCormack, Rec. III, p. 229), though, from what is outlined in the paragraph of the opinion (pp. 20–21), (38 F.Supp. 907) just preceding this sentence, it is clear that these negotiations began at least as early as in March, 1935.

However, the date of beginning these bribery negotiations is entirely unimportant. The sentence to which objection is here made could have been omitted from the opinion without being missed. It was as to an entirely immaterial matter.

There can be no dispute that the negotiations had proceeded to completion by the latter part of April, 1935, when Street asked Haid to arrange the New York meeting (for May 2, 1935) and when, a day or two before May 3, 1935, Street asked Long to arrange the Hartford meeting (for May 3, 1935)—at which meetings the $100,500 initial bribe payment money was contributed.

As to the apprehension, expressed by counsel, that this language might be construed as meaning that the Subscribers Actuarial Committee was, by formal minutes, authorizing these bribery negotiations, it is sufficient to say that such matter was not in our minds, one way or the other, in making the above statement. As said above, the sole purpose of referring to any action of the committee was in an attempt to state the approximate time when the bribery negotiations began.

### Item X.

 This has to do with a portion (bracketed for identification) of the opinion (p. 30), (38 F.Supp. 912) as follows: "[At that meeting, the outline terms of a settlement were determined. This meeting was participated in by O'Malley, Street, McCormack, Folonie, local counsel for the companies,] counsel for the Superintendent and an actuary from the office of the Superintendent." This quoted portion is immediately followed by the sentence: "Counsel later worked this outline into the formal agreement of May 18, 1935."

The motions alleged that the bracketed statements are "entirely erroneous" because Folonie was not present "when the terms of the settlement were determined" and he, Parker and Terry were not present when "the terms of the settlement were discussed" (Motions, p. 7).

What difference, as to the issues here, could it make whether any one was present at this meeting other than O'Malley and Street? They were the only contracting parties—O'Malley for himself as Superintendent of Insurance, and Street as "Agent" for the companies—only they executed the formal agreement (Rec. I, p. 31). There is no question but that both of them participated in the entire meeting. Any and all others present—during parts or all of the meeting—were there merely in an advisory capacity to O'Malley or to Street. In what possible way could the presence or

---

[11] The slightest arithmetical calculation would have revealed that this trust fund was very large—it was $2,702,789.15 (Rec. III, p. 530).

[12] The quotation, in the Motions, from the opinion is slightly erroneous in that italics are inserted which are not in the opinion.

lack of presence of such advisors at the meeting affect in the slightest the issues before us?[13]

While no mention is made of it in the motions, there is a misstatement in this passage which we wish to correct. That statement is that "local counsel for the companies" was present. This statement is erroneous. Mr. Homer H. Berger, such local counsel, had no connection whatsoever with this meeting. This is not material but is true.

### Item XII.

■ This item (as well as an argument under Item II) has to do with the claimed non-participation of six companies in the bribery contributions. The contention in the motions seems not so much that either statement in the opinion (Items II or XII) is really incorrect—as to Item II, the claim is that an erroneous inference might be drawn from the language of the Opinion, while reliance is placed, in the motions, upon the statement covered by Item XII—but that the opinion has omitted discussion and determination of the claimed particular status of these 6 companies. It is true that this claimed particular status is not specifically discussed in the opinion. This status did not impress us, when the opinion was written, as determinative[14] and therefore it was not discussed separately from the other 60 companies of the 66 companies grouped in the argument. However, it now seems it might have been better to have discussed it, if for no other reason than to avoid the impression, conveyed in the motions, that it was overlooked. We do so now. First, we shall attempt an outline statement of the facts as to each of these groups, which were made up of these six companies, and thereafter will discuss the materiality of the two differences (from the other 60 companies) which counsel now urge. A knowledge of such facts is necessary to understand the contentions concerning them.

The six companies involved compose Groups 6, 21 and 50[15] and were part of the 66 company classification in the companies' brief on the merits. All of the payments by the companies in these three groups were confined to the 5% from the 11% paid them by the trustees. The facts (other than those stated in the opinion (pp. 36, 38 & 46), (38 F.Supp. 914, 915, 918) concerning these three groups are as follows.

*Group 6.* This group is composed of three companies (Bankers and Shippers Insurance Co., New Jersey Insurance Co., and Pacific Fire Insurance Co.). The executive (L. R. Bowden) handling this transaction knew the terms of the settlement agreement and that the 30% passing thereunder to the trustees was to cover "all expenses incurred by the State and by the companies" in connection with this litigation (Rec. II, p. 75). Erskine brought him the 11% checks and requested checks from his companies for 5%. Erskine "gave me the option of making the check to Mr. Street or to Mr. Folonie as Agent" (Rec. II, p. 77).

---

[13] While not at all material, probably as clear an idea of what occurred relating to who was present is in the testimony of Terry (Rec. III, pp. 380–384). From this it appears that Terry, Folonie and Parker were at the meeting during part of the morning (Rec. III, p. 381) and it is fairly inferable that Folonie was excluded from the meeting because of friction between him and Street (Rec. III, pp. 382, 383). Mr. Folonie testified that he was opposed to any settlement "except as an incident to getting a court decision on the issues that I believed to be supreme" (Rec. III, p. 208) and had repeatedly expressed this view to Street (Rec. III, p. 209). Folonie testified, also, as to matters discussed while he was in the meeting and that about noon he, Terry and Parker were asked to withdraw (Rec. III, p. 211).

[14] Apparently, counsel for those companies thought the difference was not great. In the oral argument on the merits (printed copy p. 44), General Bullitt said: "These six companies stand in a *slightly* different position from any of the remaining 139 companies" (italics added). Again (p. 48) in speaking of the "differences in the Companies", he stated: "Now, we come down to the points that I especially wish to bring to your attention. There are differences that cannot be ignored between some of the companies. *I do not think they are very material differences.* But those differences are the reason the Brief has been prepared in such a way that will enable you to grasp all of the facts without some of the confusion that I am afraid my friend, Judge Henson, fell into" (italics added) Again (p. 49) in speaking of the 6 companies, he said: "They are also a part, for convenience, of what we call the sixty-six companies."

[15] In one place in the motions (p. 8) one of the groups is stated as "59" but this is obviously an error as shown later in the same paragraph.

Bowden selected Folonie because he knew him and did not know Street and because Folonie had been "our attorney for a number of years in other matters" (Rec. II, pp. 77, 90). Counsel for the companies tried unsuccessfully, on cross-examination, to get the witness to say that he selected Folonie because he was their attorney in *this* litigation (Rec. II, pp. 91, 92). Bowden testified (Rec. II, p. 76) that Erskine: "said that he had a check for 11 per cent of the amount we had impounded. That was a returned expense check, but he still wanted another check given to him for 5 per cent. He wanted to trade the 11 per cent for a 5 per cent check, which would net us 6 per cent. I asked him in a general way what the 5 per cent was for, and as near as I can recollect he told me for further attorney fees. I don't remember in detail at all, but whatever I asked him convinced me that it was all right for me to issue the check.

"Q.26. Well, did he tell you that the 30 per cent fund had been exhausted? A. I don't recall his telling me that.

"Q.27. Well, you knew that 30 per cent was there for the payment of expenses? A. Surely, I knew that.

"Q.28. Did you ask him why he was trading you, giving you 11 per cent and exacting from you 5 per cent instead of simply giving you a straight 6 per cent check? A. I don't recall asking him anything specifically like that, and I think our conversation was more general.

"Q. 29. Did the thought occur to you that that was an unusual way and a cumbersome way of handling it? A. I don't think it did.

"Q. 30. It never occurred to you in any way? A. I don't think it did."

Bowden knew the check was not for legal fees to Folonie but did not know to whom (Rec. II, 88). Erskine wanted the checks "right away that day" (Rec. II, p. 77).

The three checks were issued to "R. J. Folonie, Agent" (Rec. II, pp. 79–81). They were dated March 24, 1936. They were delivered by Erskine or Haid to Street who kept them until some time in "October or November, 1936" (Rec. III, p. 197) when Street had Folonie endorse them "to the order of C. R. Street" (Rec. II, pp. 79–81). Apparently, they were cleared by Street November 17 or 18, 1936 —the payment stamps on these checks are hardly legible (Rec. II, pp. 79–81).

*Group 21.* This group was composed of one company (The Hanover Fire Insurance Co.). The company officials handling this transaction have died and direct testimony as to what occurred in connection with giving of the check is only such as shown by company record and files. These files show this check to be for 5% and given in connection with a received check for 11% (Rec. II, pp. 12, 13, 14) and that it was treated as "legal expense" (Rec. II, pp. 13, 14). As to why the check was made to "R. J. Folonie, Agent", there is no direct testimony. However, it is fairly inferable that this was because (this matter being presented to the company either by Haid or Erskine (Rec. II, p. 367)) Street had instructed Haid to have the companies "make them [the 5% checks] to me as agent or if some companies want to make them to Folonie, it is all right, better make them to me as agent" (Rec. II, p. 414); and (as shown as to Group 6 above) this option as to payee was sometimes given when Haid or Erskine asked the 5% checks from companies (R. II, p. 77). While the situation as to death of these executives makes it impossible to know, by direct testimony from company officers, what took place when the 11% check was presented to this company and the 5% check from it secured, yet we do know that either Haid or Erskine handled this matter because this company was one of the list of companies from which either Haid or Erskine made collection (Rec. II, p. 362). All that Erskine knew about the need or use for any 5% checks was only what Haid told him (Rec. II, p. 350, 353), and all that Haid told him was that he was to deliver the 11% checks, get the 5% checks, and that the 5% checks were to be charged by the companies "for legal expenses in connection with the Missouri rate settlement" (Rec. II, pp. 351, 353). Erskine got the impression that there was need for hurry in getting the checks (Rec. II, pp. 352, 353). Erskine communicated this information to the companies he handled (Rec. II, p. 353). All that Haid knew about the purposes for the 5% checks was that Street said he needed about $350,000 more for "legal expense", that the trustees would pay a dividend to the companies of 11% and he wanted 5% back (Rec. II, pp. 394, 395); that the 5% checks could be made to him as agent or to Folonie but better to him as agent (Rec. II, p. 414); and that he desired Haid to assist in distribution of

the 11% checks and in collection of the 5% checks (Rec. II, p. 399).

There is no reason to doubt that these (now dead) executives had the same information as to the settlement agreement or decree provisions concerning the purposes of the 30% trust provision which the other companies had gained from the circular letters sent by the Inspection Bureau and by the Actuarial Committee.

Check dated March 23, 1936, to "R. J. Folonie, Agent"; endorsed by Folonie (at same time as those in Group 6) "to the order of C. R. Street" and cleared November 17, 1936 (Rec. II, p. 11). This check was mailed direct to Street in letter dated March 23, 1936 (Rec. II, p. 12).

*Group 50.* This group was composed of two companies (Sun Insurance Co., Ltd., and the Patriotic Insurance Co. of America). Executive handling matter knew the 30% of impoundments were allocated to the trustees for the purpose of payment of expenses (Rec. II, p. 16). He thought that Mr. Erskine (who brought to him the 11% check from this 30% fund and who requested the 5% checks) was a messenger from Mr. Folonie in the matter (Rec. II, p. 17). Erskine told him that the 5% was for "expenses"; that he could give him no details about it; and to whom the check should be drawn (Rec. II, p. 17). Thereupon, the two checks for the 5% were drawn to "R. J. Folonie, Agent".

The checks were drawn on March 23, 1936; endorsed to Street by Folonie (at the time he endorsed checks by Groups 6 and 21 above); and cleared November 17 or 18, 1936 (Rec. II, p. 22; III, p. 203)—the date of payment is hardly distinguishable on the checks but is probably November 17 since there is no conceivable reason why Street would not cash these checks at the same time he did those from Groups 6 and 21.

*Contentions.* Having stated the facts, we turn to the two matters urged by counsel which are (1) that the checks of these 6 companies were payable to "R. J. Folonie, Agent" instead of to Street; and (2) that (it is claimed) none of the proceeds thereof were used as bribe payments.

We see no force in the fact that these checks were made payable to "R. J. Folonie, Agent" instead of to Street as agent.[16] The particular individual (Street or Folonie) who was payee is not material since none of the 5% checks was payable to either as trustee. The material thing is as said in the opinion (p. 59), that: "These entire proceedings were obviously very unusual. On the face, it was a payment (11%) from the unneeded balance in the trust expense fund and a contribution (5%) to other than the trustees, either for unrevealed purposes or for purposes covered by the trust terms."

As to the proceeds of the checks of these 6 companies going into the bribe payments. It is not determinative of the situation as to the 6 companies whether or not the proceeds were used in bribe payments. Undoubtedly, they were collected for that purpose and for that alone and such collection was under very unusual circumstances which should have excited inquiry. Whether Street, months thereafter, made other use thereof is, also, by no means controlling. However, it is fairly certain that this money, or at least most of it, was used to make the last bribery payment ($10,000) to Pendergast.

The agreed bribe was $500,000, later raised to $750,000. Of this amount only $430,000 had been paid before October, 1936. "About six months" after delivery of the $330,000 bribe payment (Rec. III, p. 249), O'Malley asked McCormack (in St. Louis) to go to Street (in Chicago) and see if he could get a further $10,000 for Pendergast. This date is uncertain but could not have been before the early part of October, 1936, and almost certainly was about the middle of November.[17] Such payment made about the middle of November would coincide perfectly with the cashing of these 6 checks by Street.

While it is not controlling whether the proceeds of these six checks were used as bribe money yet it is clear that they went

---

[16] In fact, nine of these 5% checks by other companies or groups (aggregating about $25,000) were made to "C. R. Street" without the designation "Agent" and three checks (aggregating $25,500) contributing to the initial $100,500 collected at New York and at Hartford were payable to "R. J. Folonie, Attorney" and one to "Hicks and Folonie, Attys" (Rec.

I, p. 400; I, p. 148; II, p. 468; III, p. 181).

[17] This deduction as to the middle of November is derived as follows. The only witness directly testifying to this transaction is McCormack. However, there is other evidence bearing upon the matter.

McCormack was very uncertain about dates, stating: "You can't rely on me

into a fund from which the last bribe payment ($10,000) was made. When O'Malley asked McCormack (in St. Louis) if he would go to Chicago and see if Street would give him $10,000 for Pendergast, McCormack did so. Street said "he would *get it* and send it to me [McCormack] or have me come up and get it" (italics added) (Rec. III, p. 249). Later—but how much later the evidence is entirely silent—Street sent this money to a bank in St. Louis for McCormack. At the time of this request to Street, he had only $4,564.88—the balance after paying the $330,000.[18] This left $5,435.12 to be secured by Street before he could have the $10,000 to send McCormack. There can be no suggestion, based on the evidence, that there was any other source for him to procure this needed sum except from the checks of these six companies which, for some unaccounted for reason, he had not theretofore cashed. These six checks were cashed upon the same day (November 17, 1936) and aggregated $13,022.26. This sum, with the above $4,564.88 balance, gave Street a fund of $17,587.14

---

for dates because I just can't recall dates" (Rec. III, p. 236). As to the time the $330,000 was delivered to him by Street he testified (Rec. III, p. 246) as follows: "Then it was in the spring of 1936. You don't recall that it was April 1st, do you? A. I do not recall the date.

"Q. 206. Is that about the correct date? A. I would think so, yes."

When asked as to the delivery of the last payment—$10,000—he stated (Rec. III, p. 249) it was his "recollection it was about six months" after delivery of the $330,000. The above evidence would place the last delivery "about" October first, 1936. However, as said above, this evidence is avowedly uncertain and, at best, an approximation.

The other evidence has to do with the probable time of delivery of the $330,000 as a basis for estimating the time of this $10,000 payment which McCormack thought was about six months later. There was no reason why Street should have made any of these four payments to Pendergast until he had collected the money for the particular payment and that seems certainly what he did. It thus becomes important to know when he had collected enough money from the 5% payments from the companies to give him $330,000 to make this payment to Pendergast.

Before any of these 5% checks came to him, Street had only $500—left over from the *initial* collections (at New York and at Hartford) of $100,500 from which he had sent Pendergast $100,000 in two equal instalments. The 87 checks from all of the various companies covering the 5% payments (Master's Rep. pp. 293–297) aggregated $347,582.64. This total *included not only* the six checks from these 6 companies aggregating $13,022.26 (which were not cashed until November 17, 1936) *but also the following checks:* one check for $495.50 from the Caledonian not cashed until November 27, 1936 (Rec. II, p. 431); one check from the Lincoln ($694.52), and one from the Mer-

chants ($669.40) aggregating $1,363.92 and both of which were cashed April 16, 1936 (Rec. II, p. 301; III, p. 300); one check from the Fire Association of Philadelphia for $2,929.90 cashed May 11, 1936 (Rec. III, p. 423); one check each from the Lumberman's ($1,221.22), the Reliance ($794.78) and the Reliance for the Victory ($479.69) aggregating $2,495.69, all of which were cashed May 12, 1936 (Rec. III, pp. 424, 425 and 426). Subtract the total of the above checks ($20,307.27) not cashed before April 16, 1936, from the total of *all* 5% checks ($347,582.64) and the result is $327,275.37. This sum plus the above $500 (balance from $100,500) gives $327,775.37 which was the greatest amount of money Street had *until* April 16, 1936. On that date this amount was increased by the two above checks cashed that day ($1,363.92) to $329,139.29. This sum was increased by the check ($2,929.90) cashed on May 11, 1936, to $332,069.19.

Thus it was not until May 11, 1936, that Street had collected enough money to make the payment of $330,000 to Pendergast. The particular amount of this payment ($330,000); the lack of necessity for Street making any payments before he had collected the money therefor; his lack of other funds from which to make payments; his custom of so collecting before paying, all convince that this payment of $330,000.00 was not made earlier than May 11, 1936. If such payment was made shortly after May 11, McCormack's estimate that the $10,000 payment was made about six months after this $330,000.00 payment would make it about the middle of November, 1936.

[18] Including the $500 balance (from the initial bribe payment of $100,000) and the last checks cashed (May 12, 1936, aggregating $2,495.69) prior to cashing these 6 checks on November 17, 1936, the total 5% collections up to cashing of these 6 checks were $334,564.88. From this $330,000 was paid to Pendergast.

954

from which he could, for the first time, make this requested payment of $10,000 and such payment was surely made therefrom.

The argument that Street appropriated the proceeds of these six checks has no support in the evidence. Those proceeds formed part of a fund from which this last bribery payment was made.. After this payment was made, there remained a balance in this fund (from which the $10,000 payment was made) of $7,587.14 in Street's hands.

While it is immaterial, there is no word of evidence justifying the statement that Street appropriated even this balance. The settlement agreement (bought by the bribes) provided for settlement of the state court proceedings as well as those in the federal court (Rec. I, p. 28). These state court proceedings were yet undisposed of when this last payment was made. The more probable theory—although there is no evidence either way—is that the "impression" of McCormack (Rec. III, p. 253) that payment of the balance of the bribe money due Pendergast was connected with disposition of the state court proceedings is correct. If he had intended *embezzling the proceeds of these 6 checks,* it is very strange that he held them uncashed for months and then cashed them only when he had need of funds to meet the requested $10,000 payment. So far as it is shown in the evidence, the conduct of Street is much more consistent with the conception that he was holding these checks and these various balances to meet further payments to Pendergast than with the idea that he embezzled anything.

*Conclusion.* In the opinion we treated these six companies along with the other companies making the 5% payments. We conceived then no reasons why there was anything in their situation to differentiate them from the other companies in respect to knowledge or notice. In view of the contentions advanced in the Motions for New Trial as to these six companies, we have again examined the situations of these six companies in the light of those contentions. We see now no reason whatever to alter the views expressed in the opinion much less any reason for granting new trials to all or any of these six companies.

## Item XVII.

■ In the preliminary portion of part "IV" of the opinion, dealing with

*"Discussion And Determination"* of the issues before us, occurs the statement "This Court will not stultify itself by *leaving those decrees* [of February 1, 1936] *in full effect as to these funds,* if the decrees were obtained by bribery and resultant fraud upon this Court in procurement of those decrees: provided, the companies are legally responsible for such reprehensible actions." Italics added. Op., p. 51, (38 F.Supp. 921). The above-italicized language is attacked because, the motions state (pp. 10–11): "no question exists" as to leaving the decrees in full effect; they have not been in full effect since restoration of the funds by the companies under the show cause orders of May 29, 1939; and "no one is asking that the decrees be left 'in full effect as to the funds'—as they have long since ceased to be in effect."

It is difficult to understand the statements that leaving the decrees in full effect is not an issue here or that no one is asking that they be left in effect. The issue of leaving the decrees in "full effect" is here because of the answers of the companies to the show cause order. Therein they plead that unless the superintendent agrees to restore the status quo completely then "the said decree ought to remain in full force and effect and all sums adjudged to the respective parties in said decree be distributed and paid as in said decree provided" (printed answers, p. 27). Also, it is therein pleaded that "This Court may not in law and in equity distribute the sums in the possession of its Custodian otherwise than according to the terms of the final decree" (same, p. 27) if the superintendent does not restore the status quo and that to do otherwise would be violative of due process. The prayer of such answers is to like effect. Also, there are the various jurisdictional attacks upon the power of this court to open, vacate, or alter those decrees in any manner.

Instead of it being true that "no one is asking that the decrees be left in full effect", the companies are insisting that this court has no jurisdiction to alter those decrees in any degree. They present this argument in support of these very Motions for New Trial which contain the attack upon the opinion now being considered.

## Items XVIII and XIX.

■ These Items have to do with the statements of our conclusions in the opinion (p. 58), (38 F.Supp. 924) that

"There was implied knowledge as to every one of the companies", etc., and that "The circumstances under which the 5% payments were made should have put any reasonably prudent man on inquiry as to the purposes for which that money was to be used."

The attack is that these statements are erroneous as to the 79 companies (not contributing to the initial $100,500 bribery collection but making the subsequent 5% payments) because: (1) had such companies actually discovered the bribery transactions even when asked for the 5% payments such knowledge "would not have prevented that which had already been done", that is, procurement of the fraudulent decrees; and (2) such companies had (after *actual* knowledge of the bribery transactions) done all that they could do when they returned the funds paid them under the decrees.

The essence of these contentions is not that implied knowledge was absent when the 5% payments were made. It is twofold, as follows: first, that even actual knowledge could not have affected the rights, duties and liabilities of these 79 companies because it would have come to them after the decrees had been entered; and, second, that, when actual knowledge did come to these companies, they did everything possible to cure the situation by returning to the court the fruits from the decrees.

As stated in the opinion (pp. 57–58), (38 F.Supp. 923), implied knowledge is, in legal effect the equivalent of actual knowledge. We have held that each of these 79 companies had—at the time the 5% payments were made by them—implied knowledge of the existence of the bribery transactions and their results. Therefore, the measure of the rights, duties and liabilities of these companies is the same as though each had had actual knowledge—at the time it made its payment—of the situation. That situation was that Pendergast, O'Malley and Street had caused this court to enter decrees disposing of the impounded funds; that such results were caused by a bribe of $500,000—$750,000 to be paid to Pendergast, of which only $100,000 had been then paid ($22,500 going to O'Malley) and of which the companies (including these 79 companies) were then being requested to contribute to a further payment on the agreed amount of the bribe.

When they (with that knowledge—implied or actual) made such contributions, they became as reprehensible participants in the transactions as did those who contributed to the initial payment of $100,000. In this situation, the obvious duty of these companies was to refuse to contribute or to receive any proceeds (the 11% payments) from such transactions, to return all payments made under the decree, to disavow all benefits from the decree and promptly to bring the matter to the attention of this court for any action it might think proper. When they omitted to do these things, they made themselves subject to any action this court might deem proper if the court should, thereafter, be apprised of the imposition upon it. Litigants are as much bound by public policy to protect the integrity of the courts as are the courts themselves. They step outside those bounds at their peril.

Instead of doing what they should have done, these 79 companies made their contribution to the bribery funds; retained their proceeds resulting from the bribery transactions; and left this court uninformed. The fact that these payments were made after the decrees is not material under the circumstances here. Suppose the bribery agreement had been that no money should be paid until after decrees had been entered, would that excuse those knowingly contributing to such after payment?

Nor does any willingness to make repayment to the custodian, when months afterwards the bribery deal came to their actual knowledge, change the situation. When these companies voluntarily and with implied knowledge of the situation made these 5% payments instead of doing as they should have done, they fixed their status for the purposes of these proceedings. When outside agencies, three years later, made public the bribery transactions and the imposition upon this court, there existed then no locus poenitentiae for these companies.

If the actual knowledge they gained then could change their situation, then the implied knowledge they had earlier would not be the legal equivalent of actual knowledge —it would be just of no effect whatever. The practical result would be that a party could close his eyes to situations which should put him upon inquiry without any risk whatsoever since, in case the actual situation were later brought to light by others, he would suffer no detriment through the easy expedient of returning

whatever he had gained. Such doctrine would eliminate all practical effect of the firmly established rules as to implied notice.

### Item XX.

■ This item has to do with the statement in the opinion (p. 60), (38 F.Supp. 924) that "As to the six companies of which Street was vice-president, there was really actual knowledge." The challenges to this statement are: that Street was vice-president of only four companies; and that only five companies in the group (Group 20) wherein Street was an official were parties to this litigation.

This group was known as the "Great American" group and was made up of eight companies (Rec. I, p. 211, 393, 394) of which five (instead of six, as stated in the opinion) were involved in this federal court litigation. The criticism that the opinion was in error in stating "six" instead of five companies is well founded. The erroneously included company is the Rochester American Insurance Company. Since this company was not a party to this litigation and could not, therefore, be affected by anything said or done by this court in such litigation, the triviality of this particular criticism is obvious.

■ The other criticism that Street was not vice-president of one of the five companies (Detroit Fire and Marine Insurance Company) is not well founded. The president (Koop) of the group companies states Street was not vice-president of this particular company (Rec. I, p. 394) although he states that all of these companies would follow "Street's direction" in this "Western territory" and that Street represented "all of these companies in the Missouri rate litigation" (Rec. I, p. 395). A vice-president (Waldron) of the Detroit Fire and Marine Insurance Company states Street was a vice-president of the company (Rec. I, p. 211). Koop was president of seven of the group companies and chairman of the board of the eighth company (Rec. I, p. 394). While he states Street was not vice-president of this company, he shows (Rec. I, p. 394) lack of certainty as to whether Street was vice-president of some of the other companies where it is not questioned that Street was in fact such vice-president. Waldron was an official solely of this one company (Rec. I, pp. 206,

211) and the activities of his company in the Missouri rate litigation were under his "Jurisdiction" although Street had "carried on this litigation since, well, fifteen or sixteen years" (Rec. I, p. 211). In this state of direct conflict of testimony, we believe that the situation of Waldron was such as to make his testimony more accurate. We think the statement in the opinion to the effect that Street was vice-president of each of the companies in this litigation is correct. Whether correct or not is entirely immaterial because there can be no doubt that he was in control of these companies in this litigation. It was within his authority to authorize the checks from this group (Rec. I, p. 414); the vouchers for the checks were signed by him (Rec. I, pp. 398, 402); and the checks issued through his office (Rec. I, 417).

### Conclusion.

Our conclusions as to all of the items discussed above are (1) that some of the claimed inaccuracies do not exist; and (2) that no one or all of such statements in the opinion as are incorrect has or have the slightest material bearing upon the ultimate fact results reached by us and stated in the opinion. Therefore, they present no basis whatsoever for granting a new trial in any of these cases.

### III. Findings of Facts.

■ In so far as the Motions for New Trial attack specific findings, they are aimed at the verity of ultimate facts with one exception. As to these challenged ultimate facts, we need say only that we are satisfied with such findings and have been shown no convincing reason to change them in any respect.

The above-noted exception applies to the opening statement in Finding "VI". There the court stated "*After the payments (under the above decree) had been made to the company and to the trustees* and had been practically completed to the policyholders, it was brought to the attention of this court that the settlement might have been procured by bribery and the court have been imposed upon and made an innocent instrument in the effectuation of such settlement *so obtained*" (italics added). It is contended that the italicised portion of the foregoing quotation is erroneous.[19]

---

[19] This contention involves the same matter treated in Item V under part "II. *Errors in Opinion*" of this present opinion. It is there shown that payments had been fully made to the companies and to the trustees except as to funds which

What of it? Suppose that in place of this italicised statement in the quotation, this court had set forth every detail of the payments ($7,190,982.99) to the companies and to the trustees and every detail of the expense funds balance in the hands of the custodian at the time the bribery transactions were first brought to the attention of the court, in what possible way could this finding be materially affected?

The insertion of the one word "forthwith" after the first two words ("After the") of the quotation would make the statement as accurate as possibly even counsel could desire. However, we can see no useful purpose in making an entirely immaterial change in a finding. See 5 C.J.S., Appeal and Error § 1787, p. 1193, and citations in note 88. In this opinion we set forth the exact situation and our views as to the utter immateriality of any error in the statement now criticised.

As to the criticism of Finding IX involving the contention that, as to some of the companies, "the fraud had been perpetrated on this Court, *before* this plaintiff had knowledge of any facts", etc. (Motions p. 14), we refer to the discussion of the same matter under Items XII, XVIII and XIX of part II of this opinion.

### IV. Conclusions of Law.

The challenges directed at some of the conclusions merely present again views which have been before considered by us and, as to which, we see no reason to change our determinations.

As to the particular criticisms (II, "(b)" and "(c)" on pages 15 and 16 of the motions) directed at Conclusion "D", we refer to discussion of the same matter under Items XII, XVIII and XIX of part II of this opinion.

### V. Conclusion.

The motions seek (1) modification of the opinion, the findings of fact and the conclusions of law; and (2) granting of new trials. This opinion sufficiently explains or qualifies the opinion. Also, it explains the findings and conclusions in so far as we deem useful. The motions will be overruled and new trials denied. Orders to such effect will be entered.

### Appendix.

Companies subject to 5% provision of decrees with amounts taken from the several 50% payments to the companies to make up the 5% (furnished from custodian's books by Mr. Campbell, February 11, 1941).

| A/C No. | | |
|---|---|---|
| 271 | Agricultural Insurance Co... $ | 24.38 |
| 274 | Alliance Insurance Co......... | 275.63 |
| 276 | American Central Ins. Co... | 144.53 |
| 292 | Chicago Fire & Marine Ins. Co. .......................... | 513.46 |
| 294 | City of New York Insurance Co. .......................... | 154.37 |
| 295 | Columbia Insurance Company | 79.44 |
| 299 | Commercial Union Fire Ins. Co. .......................... | 226.64 |
| 304 | County Fire Insurance Co... | 34.24 |
| 305 | Detroit Fire & Marine Ins. Co. ..........................:...... | 895.56 |
| 312 | Federal Union Insurance Co. | 598.95 |
| 320 | Girard Fire & Marine Ins. Co. .......................... | 717.36 |
| 322 | Globe & Rutgers Fire Ins. Co. .......................... | 1,475.19 |
| 325 | Guaranty Fire Ins. Co....... | 289.12 |
| 330 | Hudson Insurance Co....... | 609.53 |
| 332 | Importers & Exporters Ins. Co. .......................... | .2,473.72 |
| 336 | Law Union & Rock Insurance Co....................... | 116.76 |
| 343 | Lumbermen's Insurance Co... | 120.75 |
| 344 | Manhattan Fire & Marine Ins. Co. .................... | 106.57 |
| 345 | Massachusetts Fire & Marine Ins. Co. .................... | 131.18 |
| 346 | Mechanics Insurance Co..... | 380.07 |
| 350 | Mercury Insurance Co....... | 30.69 |
| 359 | National Union Fire Ins. Co. | 418.73 |
| 383B | Minneapolis Fire & Marine Ins. Co. .................... | 1,100.05 |
| 385 | Presidential Fire & Marine Ins. Co. .................... | 177.33 |
| 387 | Provident Fire Ins. Co....... | 82.35 |
| 395 | St. Paul Fire & Marine Ins. Co. .......................... | 455.29 |
| 403 | State Assurance Company... | 500.39 |
| 404 | Stuyvesant Insurance Co..... | 1,146.71 |
| 406 | Superior Fire Insurance Co... | 203.73 |
| 407 | Svea Fire & Life Ins. Co..... | 645.04 |
| 409 | Transcontinental Insurance Co. ....................... | 281.51 |
| 412 | Union Assurance Society.... | 45.20 |
| 413 | Union Fire Insurance Co..... | 375.06 |
| 416 | U. S. Merchants & Shippers Ins. Co. .................... | 417.58 |
| 418 | Victory Insurance Company.. | 629.34 |
| 422 | World Fire & Marine Insurance Co. .................... | 180.18 |
| 901 | Underwriters Grain Association ......................... | 161.88 |
| 903 | General Cover Department... | 236.47 |
| | | $16,454.98 |

---

were being held as subject to costs and expenses. Whether there would ever be any payments to the companies or to the trustees from such funds, as well as amounts (if such payments should be made), were entirely contingent upon future happenings which could not be gauged in advance nor determined until the custodian was ready for discharge.